**NATIONAL AUTOMATIC LAUNDRY
AND CLEANING COUNCIL,**
Appellant

v.

**George P. SHULTZ, Secretary, U. S. De-
partment of Labor, et al.**
**No. 22692.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1970.

Decided March 31, 1971.

Mr. Edward Hatton, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. Ashley Sellers and Charles E. Yonkers, Washington, D. C., were on the brief, for appellant.

Mr. Nathan Dodell, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., Joseph M. Hannon and Roger E. Zuckerman, Asst. U. S. Attys., and Robert B. Nicholson, Atty., U. S. Depart-

Before WRIGHT, LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant brought an action for a judgment declaring invalid a ruling of the Administrator of the Wage and Hour Division of the Department of Labor that coin-operated laundries (sometimes called launderettes) are subject to the Fair Labor Standards Act (Act), 29 U.S.C. § 201 *et seq.*, as amended in 1966. The District Court dismissed the action, stating, "[T]he Court is of the opinion that there exists no case or controversy between the parties." We find there was jurisdiction but conclude judgment should be entered in favor of defendant on the merits.

## I. FACTS

The events leading up to this lawsuit began with a letter written on January 17, 1967, by appellant's attorneys to the Wage-Hour Administrator. National Automatic Laundry and Cleaning Counsel ("NALCC") is a national trade association for the coin-operated laundry and dry cleaning industry. Its membership includes 72 manufacturers, 119 distributors and 1,260 owners or operators of over 1,600 coin-operated laundry and/or dry cleaning establishments. Its letter inquired about the effect of the recently passed 1966 amendments to the Act, effective February 1, 1967, on the status of employees of coin-operated laundries.

Understanding of the letter's inquiry requires a reference to the provisions, as they existed prior to 1966, of the two exemptions in § 13(a), 29 U.S.C. § 213 (a) (2) and (3). The exemption in § 13 (a) (2) was the conventional retail or service establishment exemption, while § 13(a) (3) specifically exempted "any employee employed by any establishment engaged in laundering, cleaning, or repairing clothing or fabrics" provided the establishment met certain further cri-

teria not here relevant. Employees of ordinary laundries or dry cleaning establishments were thus not generally subject to the Act's minimum wage and overtime requirements. In 1963, however, the Administrator ruled that coin-operated launderettes were "engaged in renting the service of the laundry machines rather than engaged in laundering or cleaning," and hence were not exempt under § 13(a) (3); but they could still qualify for the § 13(a) (2) retail or service establishment exemption if they met that subsection's criteria. W.H.M. 91:1162 (1963)

The Fair Labor Standards Amendments of 1966, Pub.L. 89–601, effective February 1, 1967, repealed the specific laundry exemption of § 13(a) (3) and added provisions specifying that establishments "engaged in laundering, cleaning or repairing clothing or fabrics" could no longer qualify for the retail exemption of § 13(a) (2)[1] and were to be deemed "engaged in commerce or in the production of goods for commerce" within the meaning of the Fair Labor Standards Act without regard to the dollar amount of gross sales.[2]

NALCC reasoned that its members were unaffected by the 1966 amendments because coin-operated laundries had been determined by the Administrator's 1963 ruling to be renting the service of laundry machines, not "engaged in laundering, cleaning or repair of clothing or fabrics." Its letter therefore said, "We wish to confirm that [the 1963 ruling] still applies to our client's business." The letter concluded by setting forth three typical fact situations prevailing in the coin-operated laundry business and requested the opinion of the Administrator as to the Act's applicability to each example.

By letter of April 6, 1967, the Administrator replied to the attorneys representing NALCC stating, in pertinent part:

> The legislative history of the 1966 amendments to the Fair Labor Standards Act makes it clear that a coin-operated launderette or dry cleaning service is engaged in laundering or cleaning clothing or fabrics within the meaning of the act. The amendments extend the coverage of the act to employees in enterprises engaged in laundering, cleaning or repairing clothing or fabrics.

> \* \* \* \* \* \*

> In the situations outlined in your letter, each of the business operations would comprise an enterprise as defined in section 3(r) of the act. Each would be a covered enterprise as defined in section 3(s) (2), provided two or more employees in each enterprise are engaged in the activities described above.

It is this interpretation of the Act that appellant challenges in its declaratory judgment action.

## II. PERMISSIBILITY OF DIRECT JUDICIAL REVIEW OF AN AGENCY'S INTERPRETATIVE ACTION

■ The Government raises the basic question whether the courts may appropriately provide the judicial review sought by plaintiff of the interpretation by the Administrator. In past decisions refraining from judicial review courts have summoned, and often confused, a variety of concepts, finding a lack in one or another of the elements a suitor must provide to obtain judicial review: case or controversy; standing; finality (or formality); ripeness; suitability of case for relief in equity or declaratory judgment. These concepts are separable, and for clarity of analysis we discuss them separately, but with awareness that they are intermeshed in the overall determination of the appropriate occasion for judicial review.

### A. *Case or Controversy; and Standing*

The District Court's ruling that no case or controversy exists between the parties was intended, as appears from

---

1. 29 U.S.C. § 213(a) (2) (Supp. V, 1970).

2. 29 U.S.C. § 203(s) (2) (Supp. V, 1970).

the cases it cited,[3] to invoke the rule that avoids judicial consideration of an administrative ruling that is only informal and hypothetical, until an enforcement proceeding is begun. We discuss this subsequently, and begin our consideration by taking up the Government's contention that, wholly apart from the lack of appropriateness of any court review at this juncture, plaintiff association lacks standing to sue, and has no interest of its own and no standing to vindicate the rights of its members.

## Standing

The Supreme Court's recent decisions have made the standing obstacle to judicial review a shadow of its former self, and have for all practical purposes deprived it of meaningful vitality. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); K. Davis, The Liberalized Law of Standing, 37 U. Chi.L.Rev. 450 (1970). The broad new test announced by the Court to determine whether a person has standing to bring a suit to challenge an administrative ruling is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U. S. at 153, 90 S.Ct. at 830.

These cases were intended in the broad to forego litigation about preliminaries in favor of early settlement of controversies, and in a large sense they carry forward the presumption favoring judicial review that was stated in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). But they must also be given significance in terms of a line of cases which has shifted the focus of the courts from primary concern with the effect of the agency position on the challenger to a lens that provides both a broader field of vision and more depth perspective, to a view, or overview, that examines the broad consequences of the administrative ruling in terms of fidelity to Congressional purpose and other requirements of the Rule of Law.

■ The courts still require a stake in the outcome to assure adversarial presentation and sharpen the issues. But even a minuscule pecuniary stake of the litigant may be sufficient if he provides a suitable and effective vehicle for vindication of larger values. Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The decisions have witnessed a steady enlargement and extension of Judge Frank's illuminating concept giving standing to a litigant not directly governed by the ruling he challenges on the ground that he has interest as a "private attorney general." See Scanwell Laboratories, Inc., v. Shaffer, 137 U.S.App.D.C. 371, 375–376, 424 F. 2d 859, 863–864 (1970), for discussion of Associated Industries v. Ickes, 134 F. 2d 694 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), and later cases. The rulings have struck the fetters of the prior judicial inhibitions and restraints that had gone beyond detachment to inaccessibility.

■ This revision of judicial thinking on the standing question has been accompanied by an adjunct line of cases that show a wide disposition to allow associations to appear as representatives of their members and to grant them standing to seek to vindicate the interests of those members. See, e. g., National Motor Freight Traffic Ass'n v. United States, 372 U.S. 246, 83 S.Ct. 688, 9 L. Ed.2d 709 (1963); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App. D.C. 391, 428 F.2d 1093 (1970); Lodge 1858, American Federation of Government Employees v. Paine, 141 U.S.App. D.C. 152, 436 F.2d 882 (April 21, 1970); Curran v. Laird, 136 U.S.App.D.C. 280,

3. The District Court cited Helco Products Co. v. McNutt, 78 U.S.App.D.C. 71, 137 F.2d 681 (1943), and Abbott Laboratories v. Gardner, 387 U.S. 136, 151, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). These are discussed below.

420 F.2d 122 (1969) (en banc); United Federation of Postal Clerks v. Watson, 133 U.S.App.D.C. 176, 409 F.2d 462, cert. denied, Blount v. United Federation of Postal Clerks, 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969); Office of Communication of the United Church of Christ v. FCC, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. of New York, Inc. v. Scenic Hudson Preservation Conference, 384 U. S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966). We need not tarry over the question whether the Association could have claimed standing on the basis of harm threatened to itself as an organization. This case was brought, and soundly we think, to vindicate the rights of its members.

The Administrator of the Wage-Hour Division considered the association to have standing to seek the interpretative ruling on behalf of its members. While such administrative standing is not theoretically decisive of standing in court, it is material. The underlying reality is that trade associations and other group representatives of interests are accepted, sometimes welcomed, by executive officials and agencies as a means of presenting and organizing in manageable form the inquiries and objections that the Government must consider. Modifying Justice Holmes' phrase, whether or not this begins as a duty, it is a necessity, and gives rise to relationships that cannot be ignored by the courts. Interest groups are, in today's complex society, an indispensable part of an effective channel of communication between government and the persons whose conduct the government seeks to affect. The channel runs both ways. The government that entertains and responds to the associations' inquiries and requests for rulings will rarely if ever be sustained in its objection that the association has no standing to challenge the ruling in court.

Some of the organizational suits entertained by the courts have been brought as class actions under Rule 23 of the Federal Rules of Civil Procedure, see, e. g., Norwalk CORE v. Norwalk Redevelopment Agency, supra. Judicious use of the concept and procedure of class suits may well enhance sound conduct of the litigation in the courts, a matter we shall consider subsequently. This is a matter of technique to be considered after the court rules, as we hold it must, that the contention of lack of standing presents no threshold obstacle.

### B. Ripeness

We jump from standing to "ripeness," and to the opinions in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and the sister cases: Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed. 2d 697 (1967) (which brings out that the issue of ripeness not only involves an inquiry into finality, as appears from *Abbott Laboratories*, but presents a separate and additional requirement); and Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967).

### Presumption of Reviewability

The approach that permeates the *Abbott Laboratories* ruling on ripeness is the presumption of reviewability developed earlier in that opinion. Examining precedents and provisions of the Administrative Procedure Act (APA) the Court stated that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." 387 U.S. at 140, 87 S.Ct. at 1511. The Administrative Procedure Act "embodies the basic presumption of judicial review to one 'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702, so long as no statute precludes such relief or the action is not one committed by law to agency discretion, 5 U.S.C. § 701(a)." 387 U.S. at 140, 87 S.Ct. at 1511.

The provision "for review of 'final agency action for which there is no other adequate remedy in a court,' 5 U.S.C. § 704," is a "seminal" provision, intended to "cover a broad spectrum of administrative actions," and part of the pattern of "generous review provisions" that "must be given a 'hospitable' interpretation." 387 U.S. at 140–141, 87 S.Ct. at 1511. As for any contention that access to judicial review be restricted on the basis of legislative intent, the Court approved the view of a leading authority that this access was too important a right to be excluded on anything less than "clear and convincing evidence" of a contrary legislative intent. *See* L. Jaffe, Judicial Control of Administrative Action, 336–359 (1965).

This approach was recently reaffirmed by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (March 2, 1971).

### General Ripeness Considerations

Neither expressly nor by implication does the Fair Labor Standards Act show a Congressional intent negativing judicial review of the kind here invoked. We discuss this later. Assuming judicial power, is exercise of that power consistent with sound judicial administration and discretion? The *Abbott Laboratories* opinion identifies the kind of "further inquiry" that is required, see 387 U.S. at 148–149, 87 S.Ct. at 1515:

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative

decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration. [footnote omitted.]

### Fitness of Issues for Judicial Resolution

In *Abbott Laboratories*, the Supreme Court found the issues fit for judicial resolution because "all parties agree that the issue tendered is a purely legal one: whether the statute was properly construed by the Commissioner * * *." 387 U.S. at 149, 87 S.Ct. at 1515. This is, of course, the precise substantive issue in the instant case—the effect of the 1966 amendments to the Act on its application to coin-operated laundries. Although the inquiry of the plaintiff Association presented three typical fact situations for consideration the approach of the Administrator was a broad legal one, based on the underlying effect of the amendments. There is no problem of identifying or refining pertinent facts insofar as the court is called upon to consider the validity of the Administrator's interpretation. There is no "record" to be studied or made, for the only record involved on this issue is that established by such materials as the law and its legislative history.

These factors pertain to the permissibility of judicial review and more than that to its desirability. The broad consideration involved in judicial review of agency actions, and particularly in preenforcement review of the kind sought by plaintiff, is not merely the declaration of the rights of the private litigants but the functioning of the judicial process. In our overall pattern of government the judicial branch has the function of requiring the executive (or administrative) branch to stay within the limits prescribed by the legislative branch.

696

■ The courts are to approach this function with a spirit of cooperation and understanding, rather than hostility.[4] They are to accord "great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Yet the importance of the judicial "supervisory"[5] function of stating the limits binding executive officials and administrative agencies establishes as a corollary the desirability that such limitations as exist not be deferred in effectiveness, provided an appropriate instance for examining and stating the limits is established by a controversy that is real and suitable for determination of the issue, suitable in such terms as the identity and reference points of the parties and the perspective they provide by their record.

*Hardship to Parties of Deferring Court Consideration*

■ In *Abbott Laboratories* the Court identified the need to avoid judicial interference with officials and agencies unless and until their decisions involve "effects felt in a concrete way by the challenging parties," and the corresponding importance in terms of a defense for lack of ripeness of the "hardship to the parties of withholding court consideration." 387 U.S. at 148–149, 87 S.Ct. at 1515.

The granting of prompt court consideration on the basis of hardship is obviously supported by the APA's provision for review of final agency action for which there is no other adequate remedy in a court. Plaintiff association (NAL-CC) says its members are confronted with adverse financial consequences if they comply with the Administrator's view and with consequences of serious litigation if they do not. The Government brief says the coin-operated laundries are not faced with a "Hobson's choice" and continues (p. 6):

"They can safely do nothing. If it later develops that the Administrator was correct, and they should have raised their wages to meet the statutory minimum, they have only to pay back the additional wages they should have been paying all along."

If the Administrator is correct in his interpretation of the 1966 law, the owners of coin-operated laundries who are paying their employees at rates which are in violation of the Act are subject not only to injunctive enforcement proceedings under § 17 of the Act, 29 U.S.C. § 217; and in extreme cases to criminal liability under § 16(a), 29 U.S.C. § 216 (a); but also to actions for double damages, denominated "liquidated damages," brought by affected employees under § 16(b), 29 U.S.C. § 216(b). The provision inserted by Congress as a meaningful penalty and deterrent cannot be passed off by Government lawyers as a prospect of no substantial legal consequence.

To some extent an underlying exposure of the businessman is established by the statute itself, and existed even prior to the Administrator's interpretation. We may assume that sound judicial doctrine would require the turning away of a lawsuit brought by businessmen who have not received an executive or administrative ruling rejecting their claim—at least in the absence of a scheme of penalties so onerous as itself to raise questions of validity, *cf.* Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). But it makes a difference that the claim of the businessmen has been considered and rejected by the government officials who have primary responsibility for the application and implementation of the statute. In *Abbott Laboratories* the Court stated that the courts properly undertook for resolution a case attacking regulations that "purport to give an authoritative interpretation of a statutory provision" and put "petitioners in a di-

4. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. ——, 444 F.2d 841 (Nov. 1970).

5. Greater Boston Television Corp. v. FCC, *supra note 4*, at 850.

lemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." 387 U.S. at 152, 87 S.Ct. at 1517. The dilemma was that of businessmen required either to change business practices or else stand "exposed to the imposition of strong sanctions," and the Government's concession that criminal sanctions would not be used was held a "subsequent representation" that could not defeat an action which "at its inception was properly brought." 387 U.S. at 154, 87 S.Ct. at 1518. In the case at bar the Government has no authority to waive the rights of the employees to sue for the double damages penalty.

Moreover, the ruling of the Administrator cannot be treated as a null, adding nothing to the Act. The authoritative interpretation of an executive official has the legal consequence, if it is reasonable and not inconsistent with ascertainable legislative intent, of commanding deference from a court that itself might have reached a different view if it had been free to consider the issue as on a blank slate. Udall v. Tallman, *supra*. Moreover, the Administrator's interpretation, which is subject to dissemination in bulletins, legal services and the trade press, has the characteristic not only of securing "expected compliance" (see 387 U.S. at 152, 87 S.Ct. 1507), but of possibly stimulating double damage suits by employees who need not fear that they would be at odds with the Government officials involved.

Section 16(c) of the Act, 29 U.S.C. § 216(c), authorizes the Secretary of Labor to bring suit at the request of and on behalf of an employee to recover unpaid minimum wages, with the proviso that this authority shall not be used "in any case involving an issue of law which has not been settled finally by the courts * * *." Yet this defense available against double damage actions brought under § 16(c), in case of legal questions not settled by the courts, has not been made available in terms as to employee actions under § 16(b). And employees may bring actions under § 16(b) as a result of advice received from Wage and Hour officials concerning their rights. Wright v. Carrigg, 275 F.2d 448, 450 (4th Cir. 1960).

Employers have received some protection as to actions for double damages by reason of § 11 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 260, which gives the court discretion to decline an award of all or part of the liquidated ("double") damages if the employer shows that his action "was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation * * *." But the provision puts the burden on the employer, see Rothman v. Publicker Industries, 201 F.2d 618 (3d Cir. 1953). There is at least a substantial question whether the defense can be established by reliance on advice of counsel who considers the Administrator's presumptively correct interpretation to be contrary to the Act.[6]

---

6. This question persists although § 11 (of the 1947 Act)—a response to the "lament" in Missel v. Overnight Transportation Co., 126 F.2d 98, 111 (4th Cir.), aff'd, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942), that the double damage penalty previously was mandatory regardless of good faith—apparently permits the defense to be made e. g., in case of advice from a Wage and Hour inspector, even though the employer has not formally requested or obtained a ruling from a Wage and Hour official that would meet the more rigid requirement of § 10, 29 U.S.C. § 259. *See* Martinez v. Phillips Petroleum Co., 283 F.Supp. 514 (D.Idaho 1968), aff'd, 424 F.2d 547 (9th Cir. 1970) ; Bauler v. Pressed Steel Car Co., 81 F.Supp. 172 (N.D.Ill.1948), aff'd, 182 F.2d 357 (7th Cir. 1950).

So far as advice of counsel is concerned, it may be an element of a good faith defense when it is not contrary to an administrative ruling. *See, e. g.,* Van Dyke v. Bluefield Gas Co., 210 F.2d 620 (4th Cir.) cert. denied, 347 U.S. 1014, 74 S.Ct. 870, 98 L.Ed. 1137 (1954) ; General Electric Co. v. Porter, 208 F.2d 805 (9th Cir. 1953), cert. denied, 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954). But where the advice of counsel is given in the face of an administrative questioning of the situation it has been held not to be sufficient in and of itself to establish "reasonable grounds" for believing there is no violation. Gustafson v. Fred

## C. *Finality and Informality of Rulings*

■ The courts will not interfere with the executive function, whether exercised by executive officials or administrative agencies, by entertaining a lawsuit that challenges an action that is not final. The APA provides in § 10 for judicial review of "final agency action." 5 U.S.C. § 704 (Supp. V, 1970). But the term "agency action" includes "rule," and that in turn is defined in § 2 as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (Supp. V, 1970). The term "agency action" thus embraces an agency's interpretation of its law, and it is the finality of that action that we must consider.

The issue of finality is, as the Court noted in *Abbott Laboratories* (see 387 U.S. at 149, 87 S.Ct. 1507), determined not by the name assigned by the agency to its action but "in a pragmatic way." The Court has found final action in a wide array of pronouncements and communications having the contemplation and likely consequence of "expected conformity." The *Abbott Laboratories* opinion (387 U.S. at 149 ff, 87 S.Ct. 1507) cites the prior cases, Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L. Ed. 910 (1956); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), involved a declaratory ruling in a letter from the FCC to one of its licensees.[7]

And *Frozen Food Express*, involving a declaratory "order," was recently cited with approval in a ruling that finality is not negatived because the agency's de-

termination concerning the application of its statute was lacking in "independent coercive effect." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970).

### *General Consideration of "Informal" Actions*

■ The Government insists that the present order lacks finality because it is "informal." In *Abbott Laboratories* the Court took note that the interpretative regulation was issued "in a formal manner after announcement in the Federal Register and consideration of comments by interested parties," and was "quite clearly definitive." 387 U.S. at 151, 87 S.Ct. at 1517. And the Court noted there was "no hint that this regulation is informal, see Helco Products Co. v. McNutt, 78 U.S.App.D.C. 71, 137 F.2d 681 * * *." *Id.*

This court's 1943 *Helco* opinion involved acts not yet done by the person subject to the challenged regulatory activity. Helco had written a letter to the Food and Drug Administration explaining why it did not consider its proposed shipment of white poppy seeds dyed blue at variance with the Food, Drug and Cosmetic Act and requested an FDA opinion. The FDA Commissioner wrote back a letter saying that it was "our considered opinion" that the proposed shipment would be unlawful. In affirming a dismissal of Helco's declaratory judgment suit, this court said: (78 U.S.App.D.C. at 73–74, 137 F.2d at 683–684)

Obviously, the declaration of the Commissioner is several steps removed from a threat of prosecution. Neither he nor his superior, the Federal Security Administrator, has power to prosecute or to require prosecution. Moreover, * * * his advisory opinion, in answer to a hypothetical question,

Wolferman, Inc., 73 F.Supp. 186, 196–198 (W.D.Mo.1947) ("To hold otherwise would be to eliminate * * * any possible recovery of liquidated damages.")

7. As the Supreme Court noted, a panel of this court disclaimed reviewability, but

that ruling was reversed by this court en banc without argument. Red Lion Broadcasting Co. v. FCC, 127 U.S.App.D.C. 129, 131, 381 F.2d 908, 910 (1967).

does not foreclose a contrary conclusion, by him, upon an actual state of facts * * *.

\* \* \* \* \* \*

To permit suits for declaratory judgments upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions to the average citizen than any possible gain which could accrue.

The general presumption of judicial reviewability, and the modern rulings implementing that approach, are not to be misunderstood as projecting a doctrine of judicial intervention as to administrative rulings or declarations on problems that are hypothetical rather than actual. Aversion to hypothetical inquiries relates to the essence of the judicial function, restricted by the Constitution to cases and controversies, and to restraint in its exercise even when the minimum of constitutional authority is established. Compare Davis v. Ichord, 143 U.S.App.D.C. ——, 442 F.2d 1207 (Aug. 20, 1970).

This limitation does not inhibit the executive or agency officials. On the contrary, the concerns of businessmen engaged in forward planning may rightly call for hypothetical or advisory consultation with cognizant government officials, in order to obtain informal predictions needed to permit optimum allocation of resources in the light of careful assessments of the alternatives. There is, however, no ongoing public interest in a judicial intervention into hypothetical situations.

There is no question then concerning the reasoning in *Helco* which disclaims judicial review of executive determinations on hypothetical inquiries. But that doctrine simply has no application to the instant case. The plaintiff Association did not present to the Administrator a hypothetical set of facts, rather it set out the actual and present operations of its members. It did not

seek to learn whether a proposed course of conduct would violate the law. The members of the association had conducted their affairs in reliance on an outstanding ruling of the Administrator, as they had a right to do, *see* 29 U.S.C. § 259; they sought to know whether their pay scales had now become illegal by virtue of the 1966 amendments to the Act and sought to confirm their belief that the outstanding ruling still applied to their business.

*Lack of Finality in Advisory Opinions Subject to Authoritative Reconsideration*

In *Helco* the court pointed out that a ruling on a hypothetical question might be subject to reconsideration when an actual problem materialized. This aspect of nonfinality, that the ruling involved does not represent the final, that is to say, ultimate, authoritative decision of the executive official or agency may be applicable even when the inquiry is not hypothetical.

A businessman unable to obtain a final, authoritative ruling on the matter at hand is nevertheless interested in an "advisory" indication, perhaps from a subordinate official, which can serve the purpose of providing an informed though not binding prediction. There are sound reasons why such advisory letters and opinions should not be subject to judicial review. This technique of apprising persons informally as to their rights and liabilities has been termed an "excellent practice in administrative procedure." [8] There is surely a need for such informality in the administration of the Fair Labor Standards Act, a law deemed "full of baffling questions of application." [9] Indeed, we are told that the "Wage and Hour Division of the Department of Labor answers some 750,000 inquiries from the public each year; of this number, 10,000 are signed by the Administrator." (Brief of Appellees, at 8.) Advisory opinions should, to the greatest extent possible, be available to the public

---

8. Commission on Organization of the Executive Branch of the Government, Task Force Report on Legal Services and Procedure 189 (1955).

9. L. Jaffe, Judicial Control of Administrative Action 414 (1965).

as a matter of routine; it would be unfortunate if the prospect of judicial review were to make an agency reluctant to give them.

It is because of a disinclination to intervene in case of a ruling that is only an "advisory," that the early cases under the Act denied declaratory judgments, notwithstanding the risk of employee double damage actions, to employers contesting bulletins or more specific notifications of coverage from the Wage and Hour Administration.[10] As the court put it in F. W. Maurer & Sons Co. v. Andrews, 30 F.Supp. 637, 638 (E.D.Pa. 1939), the courts cannot give relief merely because the "petitioner has a real problem" and "a genuine need for legal advice."

### Need for Authoritative Agency Ruling

There are two separate matters involved. One of these is the need for authoritative determination within the office or agency before its ruling can be termed final. The need for further agency consideration precludes finality on grounds not unrelated to the doctrine requiring exhaustion of administrative remedies, at least in the absence of special circumstances.

But there seems little room for the application of that doctrine when the interpretative ruling is signed by the head of the agency. In this situation we are not troubled by the questions that might arise as to the nature or extent of delegation to a subordinate official. The significance of an authoritative interpretation by the Administrator of the Wage and Hour Division, as the head of an agency, is borne out by §§ 9 and 10 of the Portal-to-Portal Act, 29 U.S.C. §§ 258, 259, eliminating liability for the employer who establishes good faith reliance on an agency's "administrative regulation, order, ruling, approval, or interpretation." What appears from the cases and the interrelated statutory provisions is that "authoritative" rulings and interpretations of the agency needed for this defense are those issued by the Administrator of the Wage and Hour Division, and not by regional or field officials, but they can be issued by the Administrator in the form of an "opinion letter." [11]

We may put to one side the kind of "finality" question that may arise when interim rulings are made in the course of a proceeding that still has a course to run in terms of its own frame of reference, in order to determine whether or not an agency will take an action in accordance with the notice it has issued. In case of such an interlocutory ruling the process of administrative decision-making is still at a stage where the in-

10. *See, e. g.,* Denver Union Stockyard Co. v. Brotherhood, 48 F.Supp. 308 (D.Colo. 1942) (Mere "notification" to employer by Wage and Hour Administrator that employees were subject to the Act; no order or ruling declaring contracts void or in any way illegal or contrary to law) ; Connecticut Importing Co. v. Perkins, 35 F.Supp. 414 (D.Conn.1940) (Opinion published in Administrator's "Interpretative Bulletin") ; F. W. Maurer & Sons Co. v. Andrews, 30 F.Supp. 637, 639 (E.D.Pa.1939) (Oral advice from Regional Office. "The title 'Regional Director' sounds as though it carries some authority with it but * * * there is nothing to show * * * what powers have been delegated to him * * * [T]here is no action threatened, proposed or suggested by anyone who has the right to act, and there has not even been any authoritative expression of opinion from

anyone as to what the view of the Government is. The petition must be dismissed because it does not disclose that there is any actual controversy now existing.")

*Cf.* two early cases where declaratory judgments were granted : Sunshine Mining Co. v. Carver, 34 F.Supp. 274 (D. Idaho 1940) (Wage and Hour Division had threatened prosecution and employees were threatening to sue) ; and Prescription House, Inc. v. Anderson, 42 F.Supp. 874 (S.D.Tex.1941) (Employees had ripened claims under the Act for deficient wages and filed a counterclaim in the declaratory judgment action).

11. United States v. Stocks Lincoln-Mercury, Inc., 307 F.2d 266 (10th Cir. 1962) ; Bauler v. Pressed Steel Car Co., *supra,* note 6 ; F. W. Maurer & Sons Co. v. Andrews, *supra,* note 10.

tervention of judicial review will "disrupt the orderly process of adjudication." Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic, *supra,* 400 U.S. at 71, 91 S.Ct. at 209. But with the authoritative interpretative ruling by the Administrator heading the Wage and Hour Division the agency's interpretative action has come to an end, and there is no fair basis for saying this process will be disrupted by judicial review.

We are aware that it is fruitful in determining whether a particular administrative action is reviewable, to analyze "the formalities preceding and attending the administrative action." Medical Committee for Human Rights v. S.E.C., 139 U.S.App.D.C. 226, 234, 432 F.2d 659, 667 (1970), cert. granted, 401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 322 (U.S. Mar. 22, 1971). However, in reviewing the issuance of a "no action" decision by an SEC official, *Medical Committee* pointed out that a lack of formality that is justified by the nature of the task at hand performed by the agency is not a barrier that must preclude judicial review. And *Red Lion* establishes that what is in form a letter—not preceded by any hearing—may be reviewable.

In view of the hundreds of thousands of inquiries the Wage and Hour Division answers each year, a lack of formality is understandable, and, of course, the overwhelming majority of these will not be appropriate for review by a court by way of declaratory judgment. But it does not follow that a letter intended as a deliberative determination of the agency's position at the highest available level on a question of importance is to be lumped together with the mass of interpretative correspondence as a mere "informal" expression. As appears from the data already cited, only 1.25% of the Division's answers to inquiries are signed by the Administrator himself.

*Presumptiveness of Finality in Interpretation Or Ruling by Head of an Agency*

Even the head of an agency, it may be contended, operates on more than one level of deliberativeness. And it may be urged that a ruling made without that kind of assurance of deliberativeness that is presented by a hearing, or a structured controversy, may be the kind of ruling that is more truly subject to reconsideration. Certainly we know that the head of an agency may make tentative rulings and may reconsider rulings previously made. This much is recognized by § 10 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 259 (1964) which permits employers to rely in good faith on the Administrator's rulings and interpretations at least until issuance of a subsequent ruling changing the rule previously announced.

We think the sound course is to accept the ruling of a board or commission, or the head of an agency, as presumptively final. If it does not indicate on its face that it is only tentative, it would be likely to be accepted as authoritative, and given the kind of deference contemplated by Udall v. Tallman, *supra.* This presumption could be negatived, of course, if the agency adopted a rule prescribing its procedure in such a way as to identify certain actions as tentative and subject to reconsideration, prescribing the means of obtaining such reconsideration. Indeed, even in the absence of such structuring in regulations prescribing agency procedures, a court might decline to entertain a litigation if it was presented not with legal defenses interposed by counsel, but with an affidavit of the agency head advising the court that the ruling in question was tentative, and outlining the method of seeking reconsideration. We shall subsequently revert to the possibility of such a procedure, but we take note at this juncture of the likelihood that such a submission would undercut plaintiff's need for judicial review since it would support the conclusion that the interpretation of the employer, not being contrary to any administrative ruling, had enough merit to qualify as a view held on a reasonable basis and in good faith, which suffices as a defense to a double damage action, 29 U.S.C. § 260.

*The Requisite Finality of Interpretation by the Head Of an Agency Not Designated for Reconsideration*

 When a published interpretation represents the initial views of an agency, approved by the Commission or person who heads the agency, when it is the product of the process provided by the agency for taking into account the position of agency staff as well as the outside presentation, when the interpretation is not labeled as tentative or otherwise qualified by arrangement for reconsideration, it has the feature of "expected conformity" stressed in *Abbott Laboratories*. This embraces conformity not only by the businessman affected but by the agency personnel. And we see no basis for saying that this interpretative "agency action" is not "final" for purposes of the APA and judicial review.

The matter of formality in the agency process helps show that the agency action involved is the product of the agency's process for assuring deliberation for this kind of action, but where that is not contested, informality in the communication does not negative the substance of what has been done and the reality that it is the "final" such action of the agency.

The opinion in this case was signed by the Administrator; it was rendered on a broad legal question affecting an entire industry group; we take it as satisfying the aspect of finality which requires an authoritative agency ruling.

D. *Survey of Overall Considerations Involved in Pre-enforcement Judicial Review*

We are concerned lest our analysis seriatim of the pertinent concepts deprive us of the vision to be grasped from taking them together. The ultimate question is whether the problems generated by pre-enforcement review are of such a nature that, taken together, they outweigh the hardship and interest of plaintiff's members and establish that judicial review of the interpretative ruling should be deferred. To some extent a balancing is involved. A distinguished commentator has concluded that the reasons for requiring the employer to await an enforcement proceeding are weak, and are not as compelling as his need for declaratory relief. 3 K. Davis, Administrative Law Treatise, § 21.08 at 189 (1958). We think this approach has merit, at least in the case of an authoritative ruling like the one before us, and we note that the problems said to militate against pre-enforcement review may be handled by appropriate adjustments on the part of the officials or the court.

Plainly there is a need for advisory interpretations by agency officials. The overwhelming bulk of these are not given by the agency head, and are not within the scope of our ruling announced today. When a general, interpretative ruling signed by the head of an agency has been crystallized following reflective examination in the course of the agency's interpretative process, and is accordingly entitled to deference not only as a matter of fact from staff and citizenry expected to conform but also as a matter of law from a court reviewing the question, there coexist both multiple signposts of authoritative determination, finality and ripeness, and a concomitant indication that the resultant pointing toward prompt judicial review will benefit the total administrative process by resolving uncertainties without intolerable burden or disruption. In the last analysis the Administrator will have latitude to restrict the rulings he signs. There is warrant, then, for discerning at least a limited presumption of pre-enforcement judicial review in the case of authoritative interpretative rulings.[12]

12. In a memorandum that reviews the pertinent decisions and discusses salient problems, Professor Vining concludes that the general presumption of availability of judicial review contains, as suggested in *Abbott Laboratories* (387 U.S. at 139–140, 87 S.Ct. 1507), a corollary of presumption of availability of pre-enforcement judicial review. G. J. Vining, Pre-Enforcement Judicial Review and Doctrine of Ripeness, Tentative Report to the Administrative Conference of the United

There is the possibility that judicial review at too early a stage removes the process of agency refinement, including give-and-take with the regulated interests, that is an important part of the life of the agency process. The considerations developed in the dissent of Justice Fortas in *Abbott Laboratories* describe realities of the administrative process that must be taken into account.

They can be taken into account under our decision. As we have indicated, an affidavit by the agency head—not a mere argument by its court counsel—that a matter is still under meaningful refinement and development, will likely provide the element of tentativeness and reconsideration that should negative finality, or in any event ripeness.

Even if the interpretation is not being reconsidered, the agency may invoke the sound discretion of the court on the ground that an enforced action was in preparation or imminent. If filing of such an action close in time permits an equally convenient determination, the court's sound discretion permits the deferral, in effect the restraint, of the action for declaratory relief. General Motors Corp. v. Volpe, 321 F.Supp. 1112 (D.Del.1970).

Another reality of the administrative process distinguishes between broad rulings on legal issues that are appropriate for court consideration, and in contrast the kind of rulings that must await and may turn on the development of specific fact situations. The courts are familiar with the need for restricting their rulings to broad questions fairly presentable in a litigation, without reaching questions of particular application that warrant separate consideration at a later time, if and when they arise. Red Lion

Broadcasting Co. v. FCC, *supra*, 395 U.S. at 395–396, 89 S.Ct. 1794; Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Courts are likewise ready to defer decision of broad questions that cannot be meaningfully analyzed without the aid of concrete factual backgrounds.

The overruling of threshold objections does not necessarily portend the propriety of a court ruling on the merits. A declaratory judgment, like other forms of equitable relief, is granted only as a matter of judicial discretion, exercised in the public interest. Public Affairs Associates v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), Lampkin v. Connor, 123 U.S.App.D.C. 371, 360 F.2d 505 (1966). In *Rickover*, the Court exercised its discretion and remanded for amplification of the record, saying, "These are delicate problems * * *. Adjudication of such problems, certainly by way of resort to a discretionary declaratory judgment, should rest on an adequate and full-bodied record. The record before us is woefully lacking in these requirements." 369 U.S. at 113, 82 S.Ct. at 582. But that kind of discretion is more soundly exercised after the court has probed the merits, and not by way of a threshold consideration.

The case brought by an organization plaintiff raises the problem of the binding effect on the members of the plaintiff. Typically the courts entertain such actions only when it appears that the organization suing as the representative of its members is their "authorized spokesman" and will effectively represent their interests. *See* American Federation of Government Employees v. Paine, *supra*; United Federation of Postal Clerks v. Watson, *supra*.

States (1970) (available pending publication in the office of the Conference).

Such a presumption doctrine retains the need for balancing of considerations. This follows from the possibility that the presumption of reviewability may be negatived by lack of hardship to the suitor providing an occasion for review, or may be offset or overridden by countervailing needs of the administrative or judicial

process like those set forth subsequently in the text of this opinion.

An entirely separate question, not considered in this opinion, is raised by Professor Vining's view that the ripeness doctrine and concomitant balancing approach are counter-productive and might profitably be eliminated or recast in a statutory codification.

Pre-enforcement review, on the other hand, may well present a situation where the defendant officials have a compelling interest in having the organization's suit for declaratory relief maintained as a class action. Before an action may be maintained as a class action, under Rule 23(a), the court must find that "the representative parties will fairly and adequately protect the interests of the class." Thus the maintenance of an action under Rule 23 provides a basis for a · litigation which will settle the controversy in which the members of the class have an interest and avoid unnecessary re-litigation. Fed.R.Civ.P. Rule 23(c) (3). See Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); cf. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

It is reasonable that the Government should be able to offset the diversion of enforcement resources required to defend a pre-enforcement review action by the assurance that the determination in such a litigation will have a reasonably broad *res judicata* effect. Moreover, the Government's interest in making a pre-enforcement suit a truly effective forum for final resolution of its controversy with a whole class of persons is heightened when the parties sought to be represented are spread throughout the country. In this situation the Government is not able to rely on intermediate appellate review as a means of establishing a binding precedent.

The general propriety of an action for pre-enforcement judicial review still gives the court discretion to respond to the reasonable request of Government officials that the action be stayed while the underlying issue is litigated in another court. See Landis v. North American Co., 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936). There is greater need and more room for discretion to await the conclusion of a proceeding in another trial court but *Landis* also teaches that there may be discretion, provided the point is reconsidered after the other trial, to await an appellate ruling. There is more reason to await the disposition of another action if that is being maintained as a class action.

■ An organization that is a sufficiently effective spokesman for the interests of its members to assure an adversarial presentation of the issues has standing to present their views even though the action is not brought under Rule 23. Moreover, it may well be that responsible Government officials are of the view that the public interest lies in confining rather than expanding the scope of the litigation. Or they may have confidence that their enforcement interests are adequately protected without insisting on maintenance as a class action. But the court that holds itself open to an organization that seeks access to pre-enforcement review on behalf of its members, has discretion to determine that the Government's request for protection of its interests warrants an insistence that this representative suit be maintained as a class action.

In the course of time other problems of administration or litigation may emerge. We anticipate that they can be managed by reference to doctrines that govern the conduct of litigation, or the scope of relief granted. We find no threshold obstacle that requires dismissal of the action before us merely because it seeks judicial review of the "agency action" of interpretation prior to the institution of an agency action for enforcement.

### III. THE MERITS

■ The question on the merits here is whether the Fair Labor Standards Act Amendments of 1966 brought the employees of coin-operated laundries within the Act's coverage. The overall purpose of the amendments was presented by the Senate Committee on Labor and Public Welfare (see S.Rep.No.1487, 89th Cong., 1st Sess. (1966) p. 2) in terms of its awareness "that long working hours and wages which barely provide subsistence are still a daily way of life for far too many of our, citizens,"

and its intention to "extend the protection of the act to some 7.2 million workers, many of whom are among the lowest paid workers in the country."

The specific amendments relating to the laundry industry carried forward this broad purpose of increasing the Act's coverage and protections for needy workers. This bill, as reported and enacted, repealed the former § 13(a) (3) exemption pertaining to an "establishment engaged in laundering, cleaning or repairing clothing or fabrics" and also amended the "retail or service establishment" exemption of § 13(a) (2) so as to exclude from this exemption "an establishment or employee engaged in laundering, cleaning, or repairing clothing or fabrics * * *." 29 U.S.C. § 213(a) (2) (Supp. V, 1970). The Committee said:

> "This section repeals the minimum wage and overtime exemption applicable to employees in *laundry and dry cleaning establishments*. This amendment, the amendments providing a new definition of section 3(s) enterprise and the revision of the retail or service establishment exemption together provide for *complete minimum wage and overtime protection for employees of such establishments*." (S.Rep.No. 1487, *supra*, at 28) [Emphasis supplied.]

Appellant argues that its members are not "laundry and dry cleaning establishments" because the Administrator's 1963 ruling, holding them to be coverable "retail and service establishments," and not mere exempt laundries, established they are not "engaged in laundering and cleaning." Such an argument has sup-

port in logic. But it disregards the plain purpose of Congress in making the amendments.

It is evident from the legislative history that what Congress intended to accomplish was a sweeping coverage of the entire laundry industry. Coin-operated laundries were generally considered a part of this industry, competitive with the other parts. There is nothing to show that Congress intended to qualify its broad purpose with a narrow reading of "laundry and dry cleaning establishments" making the broad legislative coverage inapplicable to coin-operated laundries.[13]

The broad legislative intention is illuminated by the presentation at the hearings of the problem requiring legislative action, and the Congressional rejection of certain limiting amendments. At the hearings both labor and management witnesses urged that the new legislation cover the whole laundry industry, without exemptions, in order to "be beneficial to all laundry workers."[14]

Industry representatives explicitly sought complete industry coverage because various segments of the laundry industry were in competition with each other. An industry representative described the laundry industry as having three segments: power laundries; self-service laundries; and hand laundries. The largest is power laundries; the number of such plants decreased from 1958 to 1963. "The second largest segment numerically is made of self-service laundries—laundromats or launderettes—with 9,669 establishments in 1963, an increase of 4,663 plants, or 93.1 per cent over 1958."[15] Leaving one segment ex-

---

13. We need not now consider whether the narrow administrative ruling of 1963 was right or wrong when rendered. We are not shown that it was specifically called to the attention of Congress. What we say is that the narrow approach of the agency toward these words as they appeared in former § 13(a) (3) is not consistent with the broad legislative intention of 1966 as to new § 13(a) (2).

14. Hearings before the Senate Labor Subcommittee on S. 763, S. 1741, S. 1770, S.

1986 and S. 2210, 89th Cong., 1st Sess. 839 (1965) (Institute of Industrial Launderers); Hearings before the House Labor Subcommittee on H.R. 8259, 89th Cong., 1st Sess. 1159–60 (1965) (Russell R. Crowell, President of the AFL–CIO Laundry and Dry Cleaning International Union).

15. Testimony of Harold K. Howe, Washington manager of the American Institute of Laundering, Senate Hearings, *supra*, note 14, at 832–33. These three segments

empt from the Act's coverage would put the other segments in an "intolerable competitive situation." [16]

Furthermore, the House rejected certain amendments that would have aided coin-operated laundries. The debate on Congressman Martin's proposal to exempt small laundries reflects an enlightening discussion by Congressman Dent, Chairman of the Subcommittee on Labor, who introduced the bill. 112 Cong.Rec. 11369–71 (1966):

> MR. DENT. Mr. Chairman, I rise in opposition to the amendments offered by the gentleman from Nebraska. [Mr. Martin]
>
> \* \* \* \* \* \*
>
> The laundry industry, the drycleaners, the clean linen industry all have endorsed this legislation unanimously. They have not asked for any exemptions, either on the part of the owners and operators or on the part of the employees.
>
> \* \* \* \* \* \*
>
> MR. COLLIER. The gentleman from Pennsylvania has mentioned the laundry industry being unanimously in support of this bill. Is it not a fact that there are 36,000 coin-operated laundries in this country that are unalterably opposed to this? So when we talk about the laundry industry, I think we ought to have clearly defined what segment of it we are talking about—and I have an amendment in this area which I intend to offer later.
>
> \* \* \* \* \* \*
>
> MR. DENT. Maybe they are. But they constitute one element in the

whole competitive field in that industry. I do not believe it is the purpose of the Congress to establish a competitive advantage for any of the component parts of an industrial endeavor. They are all treated alike. They are all in competition. What is the difference between a coin-operated laundry and a labor-operated laundry except that one employs more people than the other. \* \* \*

After the Martin amendment was rejected (112 Cong.Rec. 11371), Congressman Collier then offered an amendment to exempt employees of self-service coin-operated laundries with annual gross sales of less than $40,000. 112 Cong.Rec. 11621. This was also rejected after debate which referred to the previous debate on the Martin amendment, 112 Cong. Rec. 11621–22.

Appellant maintains that this court should not rely on "negative" legislative history in determining legislative intent and cites F.T.C. v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966). *Dean Foods* involved a proposal by a government agency [17] which was not acted on prior to adjournment. In the matter before us there is not merely silence, proposals languishing without any Congressional action, but positive action by Congress rejecting the limiting amendments. This legislative history reflects clear purpose, not ambiguous silence, and *Dean Foods* is not applicable.

Remedial legislation is traditionally construed "broadly to effectuate its purposes," [18] with exceptions "narrowly construed." [19] Application of these can-

---

were described as apart from the laundries that specialize in renting laundered uniforms, towels and linens.

16. Senate Hearings, *supra*, note 14, at 839.

17. The Court was moved by public policy considerations requiring that agencies feel free to ask for legislation to remove doubts as to meaning, without generating negative implications in case of inaction.

18. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

19. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960); Port of New York Authority v. Baker, Watts & Co., 129 U.S.App. D.C. 173, 180, 392 F.2d 497, 504 (1968). In *Arnold* the Supreme Court said, "We have held that these exemptions [in § 13 of the Fair Labor Standards Act] are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit."

ons of construction is fully warranted by the broad, remedial purpose of the amendments and their legislative history. They require the conclusion that the coin-operated laundry segment was included as part of the laundry industry covered by the 1966 amendments, and that the Administrator's interpretation must be sustained.

The judgment dismissing the action for lack of jurisdiction is reversed, and the case is remanded so that the District Court will take jurisdiction and enter judgment on the merits in favor of defendant.

So ordered.