321 F.2d 756
 116 U.S.App.D.C. 143
 ALCOA STEAMSHIP COMPANY, Inc., Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Grace Line Inc., Compania Anomima
Venezolana de Navegacion, Intervenors.
ROYAL NETHERLANDS STEAMSHIP COMPANY, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America,
Respondents, Grace Line Inc., Compania Anonima
Venezolana de Navegacion, Intervenors.
 Nos. 17378, 17383.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 17, 1963.
Decided June 27, 1963.
 
 Mr. Elmer C. Maddy, New York City, with whom Mr. Ronald A. Capone, Washington, D.C., was on the brief, for petitioner in No. 17378.
 Mr. Burton H. White, of the bar of the Court of Appeals of New York, New York City, pro hac vice, by special leave of court, with whom Mr. Arthur E. Tarantino, Washington, D.C., was on the brief, for petitioner in No. 17383.
 Mr. Robert E. Mitchell, Deputy General Counsel, with whom Messrs. James L. Pimper, General Counsel, and Paul D. Page, Jr., Attorney, Federal Maritime Commission, and Mr. Irwin A. Seibel, Attorney, Department of Justice, were on the brief, for respondents.
 
 
 1
 Mr. J. Alton Boyer, Washington, D.C., with whom Messrs. E. Russell Lutz and Odell Kominers, Washington, D.C., were on the brief, for intervenor, Grace Line, Inc.
 
 
 2
 Mr. Renato C. Giallorenzi, of the bar of the Court of Appeals of New York, New York City, was allowed to argue, pro hac vice, for intervenor, Compania Anonima Venezolana de Navegacion, but did not argue.
 
 
 3
 Mr. William C. McAuliffe, Jr., New York City, was also on the brief for intervenor, Compania Anonima Venezolana de Navegacion.
 
 
 4
 Mr. Elkan Turk, Jr., New York City, filed a brief on behalf of Royal Netherlands Shipowners Association, as amicus curiae, urging reversal.
 
 
 5
 Before WASHINGTON, WRIGHT and MCGOWAN, Circuit Judges.
 
 
 6
 McGOWAN, Circuit Judge.
 
 
 7
 There are before us two petitions to review the approval by the Federal Maritime Commission of a pooling agreement filed with it under Section 15 of the Shipping Act, 1916. (39 Stat. 733, as amended, 46 U.S.C. 814.) The agreement relates to southbound traffic from Atlantic ports to Venezuela, and the parties to it are Grace Line Inc. (Grace), an American carrier which operates only U.S. flag vessels in this trade, and Compania Anonima Venezolana de Navegacion (CAVN), a government-owned Venezuelan line which operates only Venezuelan flag vessel. The protestants here, respectively, are Alcoa Steamship Company, Inc. (Alcoa), a United States company which operates foreign flag vessels in this trade,[1] and Royal Netherlands Steamship Company (Netherlands), a Dutch line operating non-U.S. flag vessels.[2]
 
 
 8
 * The pooling agreement is concededly a by-product of the efforts by the sovereign governments of this country and of Venezuela to favor the movement of traffic in vessels flying their respective flags. As all parties recognize, the actual revenue-pooling provisions of the agreement are of little significance and play no role in the issues before us.[3] The controversy stems from one provision of the agreement, the so-called 'equal access' clause, which is as follows:
 
 
 9
 'Cooperation
 
 
 10
 '10. In order that both lines may enjoy access to all cargoes as defined in Article 4, it is agreed that C.A.V.N. and Grace Line obligate themselves to comply with all necessary proceedings so that the legal or administrative regulations in force in the United States and Venezuela regarding the reservation and protection of cargo to their respective merchant marines are extended to both lines.'
 
 
 11
 An understanding of the significance of this clause requires familiarity with the efforts of both Venezuela and the United States to channel cargoes into ships flying their respective flags.
 
 
 12
 1. Venezuela.
 
 
 13
 The Venezuelan government has a considerable history, extending back several years, of steps designed to cause cargoes destined for that country to be carried by CAVN. The pace and sweep of these efforts increased in 1959 with the promulgation of a decree (No. 166) that required commercial companies under contract with government agencies for public works construction in Venezuela to ship by CAVN all materials used on that construction. Although this decree does not figure in the matters at issue here, it was followed the next year by another decree (No. 255) which laid the basis for an increasingly effective preference for CAVN. This decree defined several classes of cargoes, basically dependent on to end-use of the goods, which were 'exonerated' from the payment of Venezuelan import duties. Although this decree did not itself discriminate as between carriers, its movement in that direction was completed with the issuance in 1961 of Decree No. 331, which provided that exoneration would be available only when the cargo was carried by CAVN 'or its associated services.' CAVN was empowered to grant waivers but, absent such a waiver, any shipper who was to have the benefit of relief from import duties had to use CAVN as the carrier. As a result, shippers tended to book all of their cargo which might be subject to exoneration on CAVN.
 
 
 14
 2. The United States.
 
 
 15
 Decree No. 331 had, however, some adverse consequences so far as CAVN was concerned. These were due to the circumstance that the Congress of the United States had several years earlier acted to favor U.S. flag vessels in the carriage of export cargoes financed by United States agencies, such as the Export-Import Bank. Public Resolution 17 (P.R. 17) of the 73d Congress, 48 Stat. 500 (1934), directed that such cargoes were to be carried exclusively by U.S. flag vessels, unless the Maritime, administration waived the requirement. One form of authorized waiver is that extended generally to recipient nation vessels to handle up to 50 per cent of the cargo in question where 'parity of treatment is extended to U.S. vessels in the trade of the foreign nations.'[4] Thus, by reason of the discriminatory Venezuelan decrees, CAVN could no longer participate, under the terms of the general waiver policy, in the carrying of cargoes reserved for American shipping by P.R. 17.
 
 II
 
 16
 Extensive hearings were held before an Examiner. The Examiner's initial decision recommended that approval of the pooling agreement be withheld, but the Commission unanimously rejected this recommendation, made findings of its own, and approved the agreement.[5] The Commission concluded that, from the evidence of record, it had no basis for finding that the agreement fell afoul of any of the statutory standards of Section 15 of the Shipping Act, 1916, which requires the approval by the Commission of agreements between common carriers by water. The Commission is required to disapprove any such agreement which 'it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of (the Shipping Act, 1916), and (to) approve all other agreements, modifications or cancellations.'
 
 
 17
 Although a number of reasons are pressed upon us as to why the Commission erred in approving the agreement, we believe that the central issue here, as it appears to have been in the Commission proceedings, is whether the adverse impact of the agreement upon the petitioners is so great that it must be found, as to them, 'unjustly discriminatory or unfair.'[6] This obviously turns upon a determination of facts-- a function committed by Congress to the Commission, an expert body whose findings in this regard are not lightly to be disregarded by a reviewing court.[7]
 
 
 18
 It was the Commission's view that the agreement would not operate to diminish materially the traffic carried by the petitioners in competition with Grace and CAVN. In this regard it was noted that the promulgation of Decree No. 331 had fallen with the greatest weight on Grace and that, indeed, the observable impacts upon Alcoa and Netherlands were proportionately slight.[8] The Commission found that only about 25 per cent[9] of the total traffic to Venezuela is subject to exoneration and, accordingly, affected by the agreement. This leaves three-quarters of the total traffic unaffected and as accessible to the petitioners and other competitive lines as it has been in the past. Within the affected category, the Commission found that certain commodities of a bulk character, notably wheat, are not carried by Grace, and thus remain available for carriage by petitioners, as in the past. The Commission also found no reason to expect that the liberal waiver policy followed by CAVN in the past would not continue into the future; and it did not anticipate further restrictive measures by Venezuela.[10] It concluded that there was no reason to conclude that either petitioner would, as a result of the agreement, be obliged to terminate or restrict appreciably their current operations.[11]
 
 
 19
 These findings by the Commission represent its best effort to measure the effects of the agreement in relation to petitioners. They are supported by substantial evidence in the record, and we have no basis for rejecting them without substituting our judgment in this specialized area for that of the body best qualified to exercise it.
 
 III
 
 20
 We turn to a consideration seriatim of some of the other principal contentions urged upon us by one or both of the petitioners.[12] These appear to us to be, in the main, either subordinate to, or a mere variation of, the main point that the agreement is 'unjustly discriminatory or unfair as between carriers.'
 
 
 21
 1. Alcoa asserts that the Commission erred in approving the agreement for the reason that the Commission conceived of its approval as discharging a promotional function in the interest of Grace as an operator of U.S. flag vessels. It is true that the President's Reorganization Plan No. 7 of 1961, which divided the functions of the Federal Maritime Board between the Department of Commerce and the Commission, was motivated to some degree by a purpose to separate promotional from regulatory functions. But Section 15 of the Shipping Act, 1916, stands on its own feet, and it is the Commission which has the responsibility of weighing pooling agreements against the standards therein contained. If the Commission, justifiably and on the basis of substantial evidence in the record before it, approves a pooling agreement as proper under Section 15, it is difficult to see how that result must fall as 'promotional' because one of the parties benefited happens to be an operator of U.S. flag vessels.
 
 
 22
 There was, of course, an obvious reason why CAVN was interested in pooling with Grace, as distinct from either of the petitioners. CAVN's interest was to place itself in a position to participate in Export-Import Bank traffic. It could achieve this only by associating itself with Grace, since it was only by extending parity of treatment to U.S. flag vessels that it could obtain a general waiver incident to P.R. 17. Since neither Alcoa nor Netherlands operated U.S. flag vessels, each was powerless to enable CAVN to achieve its objective, and CAVN's interest in associating with them was presumably minimal. Any 'promotional' effect flowed from this circumstance rather than from any purpose on the Commission's part to favor Grace over non-U.S. flag carriers.[13]
 
 
 23
 2. Alcoa also argues that the Commission, instead of approving the agreement, should have acted to use its powers under Section 19(b) of the Merchant Marine Act of 1920[14] to protect all U.S. commerce from foreign discrimination. Again, however, Section 15 of the Shipping Act, 1916, is a self-contained regulatory measure. If the Commission was entitled, as we believe it was, to approve the agreement under the Shipping Act, 1916, it was not obliged to withhold that approval simply because there were steps which the Commission could possibly, in the interest of all carriers, take against Venezuela under the Merchant Marine Act of 1920.
 
 
 24
 3. A third contention made only by Alcoa is that the pooling agreement violates two conference agreements to which both Grace and CAVN are parties. It is not clear whether this argument goes to the Commission's powers under Section 15 of the Shipping Act, 1916, or whether it asserts contractual breaches by Grace and CAVN. The latter would not seem to be relevant in this proceeding; and, in any event, we find nothing to indicate that these other agreements imposed any limits upon the Commission's powers and functions under the Shipping Act, 1916, with respect to pooling agreements.
 
 
 25
 4. A contention of a procedural character made by both petitioners is that the Commission imposed an improper burden of proof upon them to establish that the agreement would drive them out of the trade in question entirely, or seriously restrict their operations in this area. We do not find that in fact the Commission laid down any such requirement; and the point seems to us merely a restatement of the claim that the Commission should have found the agreement 'unjustly discriminatory or unfair.' The Commission's determination in this regard necessarily turned upon questions of degree in the light of the facts of record. With all the facts of competitive injury before it, the Commission weighed them without reference to the allocation of burden of proof,[15] and the findings it made are consistent with the conclusion that it did not require a showing by petitioners that they would, for all practical purposes, be forced to abandon their participation in this trade.[16]
 
 
 26
 The findings and conclusions of the Commission being supported by substantial evidence, and having a reasonable basis in law, the order appealed from is,
 
 
 27
 Affirmed.
 
 
 
 [1]
 Alcoa has in the past operated some U.S. flag vessels. Presently, however, it provides only foreign flag vessel service
 
 
 [2]
 Another foreign line, Skibs A/B Viking Line, was a complaint in the proceedings before the Commission, but it has not sought review of the Commission's adverse disposition of its objections to the agreement
 
 
 [3]
 Grace and CAVN agreed to share equally the revenues derived by either carrier from cargo carried in excess of 42.5% Of the total New York-to-Venezuela trade, and in excess of 50% Of the trade from other U.S. Atlantic ports
 
 
 [4]
 The other form of authorized waiver is the 'statutory waiver,' which is granted when no U.S. flag or recipient nation vessels are available from the port of shipment to the foreign destination. This waiver is explicitly authorized by P.R. 17. The 'general waiver' is authorized by the Maritime Administration when 'parity of treatment' is accorded
 
 
 [5]
 The Examiner's decision was, of course, entitled to great weight in the Commission's conclusions. But, under the statute, the Examiner's decision is recommendatory only, and the Commission was fully entitled to reject it if it had reason to view the evidence in a different light. The credibility of the witnesses was not involved. See Section 18(a) of the Administrative Procedure Act, 5 U.S.C. 1007(a); and 2 Davis, Administrative Law, 10.04 (1958)
 
 
 [6]
 No shippers or other parties intervened to oppose the agreement. There was some testimony by representatives of two Gulf ports that the agreement might be harmful to them. But the agreement does not cover traffic from the Gulf ports, and the Commission was, we think, justified in attaching little significance to this showing
 
 
 [7]
 As with other administrative agencies, this Court must uphold the Commission's order if it is supported by substantial evidence on the record as a whole, and has 'a reasonable basis in law.' NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). 'Whether a discrimination in rates or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative body, based upon an appreciation of all the facts and circumstances affecting the traffic.' Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 481, 81 L.Ed. 659 (1937)
 
 
 [8]
 Figures compiled by Grace, and adopted by the Commission, show the relative effects on Grace and the two petitioners. Excluded from the compilation are ports not served by Grace and bulk wheat not carried by Grace
 1960 1961
 ----- -----
Grace 35.2% 29.8%
CAVN 24.3% 37.3%
Alcoa 10.5% 9.8%
Netherlands 10.9% 10.6%
 
 
 [9]
 Netherlands urges that the correct figure is 30%. However, we do not consider the difference to be controlling
 
 
 [10]
 The Commission expressly signified its readiness to look at the agreement again in the light of any such actions or upon a future showing that the agreement was in fact having devastating consequences. This it is empowered to do under the reserve powers given it by Section 15 of the Shipping Act
 
 
 [11]
 This finding was supported by the fact that only a relatively small part of the cargo regularly carried by petitioners was subject to exoneration and thus covered by the agreement. Moreover, a large part of the cargo which was subject to exoneration, but which Grace did not carry, was of a type normally carried by petitioners, such as bulk wheat and fertilizer. There was no reason to believe that Grace would start transporting these products and remove them from petitioners' market
 
 
 [12]
 In an amicus brief filed in this Court, the Royal Netherlands Shipowners Association asserts that the Commission's action is contrary to treaty provisions between the United States and the Dutch Government and, therefore, violates the Supremacy Clause of Article VI of the Constitution. The point was not raised in the Commission proceedings and undoubtedly comes too late for consideration by us. In any event, we cannot see that action taken by the Commission within the framework of the Shipping Act, 1916, is in conflict with any existing obligation of the United States Government
 
 
 [13]
 Part of the difficulty here lies in the fact that, prior to Reorganization Plan No. 7, the Maritime Board had proposed certain regulations to offset Venezuelan Decree No. 331. The regulations were never put into effect, but their existence no doubt gave added impetus to the negotiations between Grace and CAVN, which had begun several years earlier. Petitioners appear to argue that, since the agreement between Grace and CAVN also offsets the effect of Decree No. 331, the Commission's approval must also be considered primarily promotional. This conclusion, of course, is not logically required, and we do not draw it in light of the findings by the Commission, which are supported by substantial evidence, that the agreement is not barred by Section 15. 45
 
 
 [14]
 41 Stat. 995, as amended, 46 U.S.C. 876. Section 19(1)(b) authorizes the Commission
 'To make rules and regulations affecting shipping in the foreign trade not in conflict with law in order to adjust or meet general or special conditions unfavorable to shipping in the foreign trade, whether in any particular trade or upon any particular route or in commerce generally, and which arise out of or result from foreign laws, rules, or regulations or from competitive methods or practices employed by owners, operators, agents, or masters of vessels of a foreign country; * * *.'
 
 
 [15]
 The Commission's statement in this regard is:
 'Upon a careful review of the record before us, we find there is ample evidence on which to base a decision on the merits. In view of such evidence the case does not turn on, and it is unnecessary to discuss, questions involving burden of proof.'
 
 
 [16]
 The Hearing Examiner disapproved the agreement on the hypothesis that CAVN would maintain the percentage of the trade which it had after Decree No. 331, and that Grace would return to the share it had prior to the decree. As the Commission pointed out, however, in disagreeing with the Examiner's decision, much of the shift in percentage carried as between Grace and CAVN was in exonerated cargo covered by Decree No. 331. And it is this cargo which is covered by the agreement, so that it cannot be said with assurance that the Examiner's prognostication would prove true. As the Commission states, '* * * the results of future shipping operations are rarely, if ever, precisely predictable. This record, however, particularly in light of the evidence it contains with reference to the traffic in the trade, does not show that there will be any unjust or unfair discrimination between carriers as a result of this agreement.' We agree