**APPALACHIAN POWER COMPANY, Baltimore Gas and Electric Company, Carolina Power & Light Company, Duke Power Company, Monongahela Power Company, Ohio Power Company, Potomac Edison Company, Potomac Electric Power Company, South Carolina Electric & Gas Company, Virginia Electric and Power Company, West Penn Power Company, Petitioners,**

v.

**Russell E. TRAIN, as Administrator, Environmental Protection Agency, Respondent,**

**Alabama Power Company et al.,**

**Jersey Central Power & Light Company, Metropolitan Edison Company and Pennsylvania Electric Company, Intervenors.**

No. 74–2096.*

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1979.

Decided April 28, 1980.

* Consolidated with Docket Nos. 74–2096, 74–2188, 74–2196, 74–2236, 74–2263, 74–2264, 74–2265, 74–2268, 74–2269, 74–2270, 74–2286, 74–2298, 74–2312, 74–2313, 74–2315, 74–2339, 74–2340, 74–2341, 74–2343, 74–2365, 74–2366, 74–2396, 75–1014, 75–1020, 75–1021, 75–1022, 75–1047, 75–1074, 75–1078, 75–1091, 75–1094, 75–1095, 75–1198, 75–1199, 75–1200, 75–1201, 75–1202, 75–1203, 75–1223, 75–1255, 75–1345, 75–1346, 75–1347, 78–1701, 78–1878, 78–1902.

George C. Freeman, Jr., Richmond, Va. (Turner T. Smith, Jr., William A. Anderson, II, E. Gabriel Smith, Hunton & Williams, Richmond, Va., on brief), for petitioners Appalachian Power Co., et al.

James Taylor Banks, Natural Resources Defense Council, Inc., Washington, D. C. (Stephen H. Schroeder, Ronald J. Wilson, Washington, D. C., on brief), for petitioner NRDC.

Richard G. Stoll, Jr., Deputy Associate Gen. Counsel, EPA, Washington, D. C. (Joan Z. Bernstein, Gen. Counsel, James A. Rogers, Associate Gen. Counsel, EPA, James W. Moorman, Asst. Atty. Gen., Land and Natural Resources Division, Bradford F. Whitman, Asst. Chief, Pollution Control Section, Barry J. Trilling, Dept. of Justice, Washington, D. C., on brief), for respondents.

Before BREITENSTEIN ***, Senior Circuit Judge, and WIDENER and PHILLIPS, Circuit Judges.

WIDENER, Circuit Judge:

These actions arise because of EPA amending its regulations to comply with our mandate in *Appalachian Power Co. v. Train*, 545 F.2d 1351 (4th Cir. 1976). In *Appalachian Power*, approximately seventy power companies sought review of the Environmental Protection Agency's (EPA) regulations promulgated under authority of the Federal Water Pollution Control Act (Act).[1] The power companies now challenge EPA's amendments to parts of 40 CFR Part 423 [2] on grounds that they do not fully comply with *Appalachian Power*. Part 423 sets out the best practicable technology (BPT) limitation standards for the steam electric power industry. Natural Resources Defense Council (NRDC), through its petitions, also seeks a review of certain EPA BPT regulations, not on the ground that *Appalachian Power* has not been complied with but on the ground that § 301(*l*), 33 U.S.C. § 1311(*l*), a 1977 amendment to the Act, prohibits EPA from modifying any of § 301, 33 U.S.C. § 1311, including BPT limitations, for toxic pollutants. It also challenges the EPA variance amendments on the ground that they did comply with *Appalachian Power* so far as the factors in § 301(c) are referred to in the amended regulations.

In 1972, Congress passed the Federal Water Pollution Control Act (Act) with an ultimate goal of no pollutant discharges into our nation's waters. Toward that ultimate goal, Congress established increasingly stringent standards of pollution control. Phase I of the Act sets best practicable technology (BPT) limitations to go into effect in 1977.[3] In 1983, best available technology (BAT) limitation standards are to go into effect.[4] Several parts of the Act were amended in 1977 but the basic goals and strategies of the Act remain intact. EPA is given broad power under the Act so that it may insure that the phases of improvement can be achieved. In order to carry out its

---

*** Honorable JEAN S. BREITENSTEIN, United States Circuit Judge for the Tenth Circuit, sitting by designation.

1. 33 U.S.C. § 1251 et seq.

2. Specifically amended were 40 CFR 423.12(a), 423.22(a), 423.32(a) and 423.42.

3. § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A).

4. § 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A).

obligation, EPA promulgated regulations setting single number effluent limitations for various industries in order to commence the achievement of the goal of the statute. In *duPont*, we held that EPA had the authority to promulgate such effluent limitations which are to be considered presumptively applicable. *E. I. duPont de Nemours & Co. v. Train*, 541 F.2d 1018, 1028 (4th Cir. 1976), aff'd on this point 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). Through the regulations, applicable unless rebutted, EPA hopes to achieve national uniformity as the goal of no discharge of pollutants is sought. Id. at 1028.

*Appalachian Power* involved a review of many of EPA's regulations promulgated to aid in the application and enforcement of the Act. Only our holding dealing with BPT variance regulations is pertinent to our decision here. Among other provisions under attack in *Appalachian Power* was EPA variance clause providing that a variance from the 1977 standards set out in the regulations would be granted when "the factors relating to equipment or facilities involved, the process applied, or other such

factors related to such discharger are fundamentally different from those factors considered in establishing the guidelines."[5] Costs were excluded from consideration by EPA's interpretation of its own regulation. We struck down the clause because EPA's refusal to consider costs resulted in too restrictive a view of the minimum content of the variance. Under the 1983 standards set out in the Act, for example, costs were to be a relevant factor. Following our decision in *duPont*, we reasoned that the Act contemplated progressively more stringent standards as the country moved closer to the goal of elimination of pollutant discharge. Therefore, the 1977 standards were not intended to be any less flexible than the 1983 standards. As a result, we remanded the regulation to EPA for the agency to come forward with a meaningful variance clause taking into consideration at least the statutory factors set out in §§ 301(c), 33 U.S.C. § 1311(c); 304(b)(1)(B), 33 U.S.C. § 1314(b)(1)(B); and 306(b)(1)(B), 33 U.S.C. § 1316(b)(1)(B).[6] *Appalachian Power* at 1359–60.

---

**5.** § 423.12(a) interpreted at 39 FR 28926–27 (Aug. 2, 1974), 30073 (Aug. 13, 1974).

**6.** § 301(c), 33 U.S.C. § 1311(c), provides:
The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.
§ 304(b)(1)(B), 33 U.S.C. § 1314(b)(1)(B), provides that such regulation shall:
specify factors to be taken into account in determining the control measures and practices to be applicable to point sources (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b) (1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment

and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environment impact (including energy requirements), and such other factors as the Administrator deems appropriate;
§ 306(b)(1)(B), 33 U.S.C. § 1316(b)(1)(B), provides:
As soon as practicable, but in no case more than one year, after a category of sources is included in a list under subparagraph (A) of this paragraph, the Administrator shall propose and publish regulations establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one hundred and twenty days after publication of such proposed regulations, such standards with such adjustments as he deems appropriate. The Administrator shall, from time to time, as technology and alternatives change, revise such standards following the procedure required by this subsection for promulgation of such standards. Standards of performance, or revisions thereof, shall become effective upon promulgation. In establishing or revising Federal standards of performance

After the Supreme Court's decision in *E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), we modified our decision in *Appalachian Power* to exclude the requirement of a variance for new sources, but declined to modify the opinion further.[7] In March 1978, EPA proposed its amendment to the BPT variance provision. 43 FR 8812-13 (1978). After a comment period, this rule was made final on September 22, 1978. EPA amended 40 CFR Parts 423.12(a), 423.22(a), 423.-32(a) and 423.42 by adding the following paragraph:

> In accordance with the decision in *Appalachian Power*, 545 F.2d 1351, 1358–60 (4th Cir. 1976), EPA's legal interpretation appearing at 30 FR 30073 (1974) shall not apply to this paragraph. The phrase "other such factors" appearing above may include significant cost differentials and the factors listed in section 301(c) of the Act.

43 FR 43025 (Sept. 22, 1978) corrected at 43 FR 44848 (Sept. 29, 1978).

In October 1978, EPA published a notice rescinding its no-cost interpretation of 1974. 43 FR 50042. In October 1978, the utilities filed this action.[8]

The utilities challenge the EPA amendment to the BPT variance provisions, contending that the mandate of *Appalachian Power* has not been met by the addition of "significant cost differentials and the factors listed in section 301(c) of the Act." Specifically, the utilities argue that *Appalachian Power* requires EPA to consider 304(b)(1)(B) factors including "total cost . . . in relation to effluent reduction benefit."

The utilities concede that the addition of "significant cost differentials and the factors listed in section 301(c) of the Act" to the existing variance provisions on its face

could fulfill the *Appalachian* mandate. They argue, however, that EPA has made it clear that effluent reduction benefits are not a relevant factor under the regulation. The utilities urge that EPA's interpretation of effluent reduction benefit is much too narrow in that it considers only costs in relation to the degree of effluent reduction with no consideration of receiving water quality. Such an interpretation, they urge, is impermissible in light of *Appalachian*.

No variance has been applied for here. Therefore, the utilities' only authority offered to show EPA's application of its newly amended regulations is the February 6, 1979 recommendation of the Assistant Administrator for Water Enforcement of the EPA tentatively turning down Cincinnati Gas and Electric Company's application for a variance for its W. C. Beckjord Station, as well as the case of *In re Louisiana-Pacific Corp.*, 10 ERC 1841 (1977). That document, the utilities contend, shows EPA's rejection of water quality as a factor in considering effluent reduction benefits pursuant to *Appalachian*. There, Cincinnati Gas' application for a variance from ph limitations was turned down because no fundamental difference was found to justify a less stringent standard. In commenting on receiving water quality, the Office of Enforcement of the EPA included in its recommendation to the Administrator the following:

> The Administrator has determined *In the matters of Louisiana Pacific Corporation* NPDES No. CA0005894 *and Crown Simpson Pulp Company* NPDES No. CA0005882 10 ERC 1841 (September 16, 1977) ("Louisiana Pacific") that EPA is not authorized to grant a FDF variance providing relief from technology-based limitations guidelines due to the characteristics of the receiving water. The type of receiving water or the fact that the receiving water quality will not be

---

for new sources under this section, the Administrator shall take into consideration the cost of achieving such effluent reduction, and any non-water quality environmental impact and energy requirements.

7. No. 74–2096, Order of September 26, 1977.

8. NRDC had filed its original petition on September 28, 1978, in the D.C. Circuit. The utilities and NRDC then filed petitions for review in this court. Upon motion, the D.C. Circuit transferred NRDC's first petition to this court. *NRDC v. EPA*, No. 78–1929 (D.C.Cir. Dec. 21, 1978).

---

harmed by the discharge or measurably improved by installing control equipment are not legally fundamental differences. Recommendation on Variance Ruling FDF 78–01 at pp. 7–8.

We think the utilities' reliance on the recommendation in the Cincinnati Gas and Electric variance recommendation is misplaced. First and principally, the Administrator has not yet taken any action with respect to the variance. That being so, we do not believe that, even assuming the utilities' construction of the recommendation to be correct, the recommendation of the Office of Enforcement to the Administrator is legally binding on the Agency. While it may have considerable significance, legal as well as practical, to the parties involved, it is little if anything more than an in-house memorandum from a subordinate in the Agency recommending to the Administrator the action he should take in passing on the requested variance. Second, the language we have above quoted, which is that upon which the utilities rely, we do not believe, read in context, can be taken to say that the Administrator in no instance will consider the quality of the receiving water as a part of the evidence in a case requesting a variance. Read literally, the language simply means that the quality of receiving water of itself is not a fundamental difference upon which a variance can be granted. This is entirely consistent with that part of our ruling in *Appalachian Power* in which we denied the claim of Consolidated Edison that it ought to be allowed to discharge into New York harbor not subject to effluent limitations because the harbor was already so dirty the addition of its effluent would make no difference. From an examination of the papers on hand in the Cincinnati Gas and Electric Company

variance No. FDF 78–01, we believe, however, that the variance was not sought solely or even principally because of the water quality of the Ohio River into which the effluent flowed. Rather, it was based principally upon cost differentials and a claim that the addition of sulphuric acid to its settling ponds to reduce their alkalinity would do more harm to the receiving water than the effluent in question in that case.

Much the same remarks apply to EPA's decision in *In re Louisiana-Pacific Corp.*, 10 ERC 1841 (1977). In that case the claim of the industry was that a discharge of its effluent into the ocean would do no harm apparently because the ocean waters were so vast. The Administrator denied that variance, again entirely consistent with our opinion in *Appalachian Power*, concluding that he could provide no ". . . relief from technology-based effluent limitations guidelines due solely to the characteristics of particular receiving waters. . . . ." He stated that he could not permit exemption where the type of receiving water is the fundamental difference between the seekers of the variance and other pulp and paper mills. In his opinion, the Administrator time and again made it plain that the only thing he acted upon was a request for a variance based solely on water quality. At no place in that decision did the Administrator indicate that he did or would hold that the quality of the receiving waters was irrelevant in all instances in variance proceedings. It is true EPA does take that position in its brief in this court: "Receiving water quality simply cannot legally be considered a relevant factor in evaluating a variance request." Brief at p. 13. But as the mere recommendation of a subordinate does not bind the Agency,[9] nei-

---

**9.** The Deputy Assistant Administrator for Water Enforcement, who made the recommendation in *Cincinnati Gas and Electric Co.*, acts only as the principal adviser to the Administrator of EPA on matters of enforcement. 40 CFR § 1.31. Thus, his decision is not binding on the Administrator. In like vein, we held that a decision of the Provider Reimbursement Review Board, an in-house-board, does not bind the Secretary of HEW, who can modify or

reverse that decision on his own motion. *Fairfax Hospital Ass'n, Inc. v. Califano*, 585 F.2d 602 (4th Cir. 1978). See also, e. g., *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (NLRB rejected examiner's findings); *Environmental Defense Fund, Inc. v. EPA*, 489 F.2d 1247 (D.C.Cir. 1973) (Administrator decided contrary to the conclusion of the Hearing Examiner regarding the banning of DDT); *Adolph Coors Co. v. FTC*, 497 F.2d

ther does the mere assertion of an attorney in a brief except for the purposes of that case. Much as we disagree with the statement, there has been no application of it in the case before us, and no binding statement has been made to that effect by the Administrator. We will have to await a proper case to see if the Administrator in actual practice, or in the administration of the statute, takes the same extreme position his attorneys do in the brief in this case. No such extreme position can be read into the *Louisiana-Pacific* or *Cincinnati Gas* variance cases.

Because we believe the amendment of the variance provision will admit consideration of all of the factors required in our opinion, and there has been no concrete application denying a variance request which is under review, we decline to set aside EPA's amended regulations as a noncompliance with our mandate.[10]

■ EPA and NRDC also ask us to reconsider our holding in *Appalachian Power* to the effect that § 301(c) factors are applicable in consideration of variances from BPT limitations. Id. at 1359–60. This issue was dealt with again by this court in *National Crushed Stone Assoc. Inc. v. EPA*, 601 F.2d 111 (4th Cir. 1979), and in *Consolidation Coal Co. v. Costle*, 604 F.2d 239 (4th Cir. 1979), cert. granted —— U.S. ——, 100 S.Ct. 1011, 62 L.Ed.2d 750 (1980). In those cases the industries successfully sought application of *Appalachian Power's* BPT variance holding outside the steam electric industry to which EPA had limited our holding in *Appalachian*. We declined to change our *Appalachian Power* variance holding in those cases, and we decline to do so here.

We should note at this point that EPA continues to argue from extreme positions which we do not believe are justified by the statute, and even are not justified by the actions of the Administrator as distinguished from the language in his brief. EPA's principal argument in this case is shown by an example it gives that a discharger of a copper compound might be granted a variance if it were on a clean river but not if it were on a dirty river. The example misses the point. If the discharger were economically able to correct its condition of violation *and* if its efforts resulted in reasonable further progress toward meeting the standard, then there is no reason to necessarily exclude the issuance of a variance. But if the continued discharge, during the time it took the industry to comply, might kill all aquatic life in the river, it might easily be said that the progress was not reasonable, while, if the discharge did little or no actual harm during this period, it might just as easily be said that reasonable progress was being made. To determine whether or not progress is reasonable, we repeat, it may be appropriate to consider water quality as *a factor*, that is to say as an item of evidence. Its sought-for arbitrary exclusion by EPA is simply too rigid a construction of the statute, and we do not believe it is justified. To hold otherwise ultimately can only result in regulation for regulation's sake, at which point, of course, a serious question of constitutional limitations would arise. We believe this useful statute deserves better treatment.

NRDC's petitions request us to hold that variances from BPT limitations cannot be

---

1178 (10th Cir. 1974) (FTC overruled Administrative Law Judge's finding that Coors had not violated § 5 of the Federal Trade Commission Act); *Peterson v. Gardner*, 391 F.2d 208 (2d Cir. 1968), (Appeals Council can rule contra to decision of the Hearing Examiner); *Alcoa Steamship Co. v. Federal Maritime Commission*, 321 F.2d 756 (D.C.Cir. 1963) (Maritime Commission rejected recommendation of examiner and approved pooling agreement); *Braswell Motor Freight Lines v. USA*, 275 F.Supp. 98 (W.D.Texas 1967), aff'd 389 U.S. 569, 88

S.Ct. 692, 19 L.Ed.2d 779 (1968) (ICC rejected recommendation of its examiner).

**10.** The utilities also rely upon EPA's comments published with its amendment of the variance provisions in 40 CFR Part 423. 43 FR 40324 (Sept. 22, 1978), typographically corrected at 43 FR 44847 (Sept. 29, 1978). The comments no more than reflect the ruling in *Louisiana-Pacific*, supra, and are not contrary to our mandate in *Appalachian Power*.

granted to a discharger of toxic pollutants because of a 1977 amendment to the Act, which states:

The Administrator may not modify any requirement of this section as it applies to any specific pollutant which is on the toxic pollutant list under section 307(a)(1) [33 U.S.C. § 1317(a)(1)]

§ 301(*l*) of the Act, 33 U.S.C. § 1311(*l*).

It is the contention of NRDC that the amendments to the various regulations should have as required content a prohibition against issuing a variance from BPT limitations on account of toxic pollutants.

33 U.S.C. § 1317(a)(1) (§ 307(a)(1) of the Act) requires the Administrator to publish a list of toxic pollutants. Upon designation of a pollutant as toxic, § 307(a)(2) [33 U.S.C. § 1317(a)(2)] goes into effect, requiring the EPA to set BAT standards for those pollutants.

As now interpreted by EPA, the variance clause applies to all pollutants for which BPT limitations are set by regulations. The BPT limitations for the steam electric industry include pollutants which are on the toxic pollutant list in 40 CFR Part 129. As noted, because of § 301(*l*), the NRDC contends that EPA in a repromulgation of its variance regulations must in terms exclude toxics from their coverage. EPA and the utilities contend that § 301(*l*) was not intended to apply to BPT, but only to the specific sections of § 301 which allow an operator to be relieved of an effluent limitation. They also argue that a BPT variance is not a true variance so as to bring § 301(*l*) into effect. BPT variances, the argument goes, do not excuse anyone from meeting BPT limitation standards. Instead, they enable EPA to determine an individual BPT limitation for an industry procuring a variance. As a result, an operator granted a variance is still in compliance with its BPT limitation standard. Its standard is just different from others.

■ It is apparent that if either argument just above stated is correct that EPA is not required to exclude toxic pollutants from BPT variances. We think that § 301(*l*) does not apply to BPT variances.

■ Toxic pollutants prior to the 1977 amendments were not treated differently from other pollutants in that BAT technology was not necessarily applied, and dischargers discharging toxic pollutants were nevertheless included in those required to comply with BPT effluent limitations. While the 1977 amendments have required BAT limitations for discharges of toxic substances, they do not indicate that they are to operate retroactively so as to possibly retract any variance previously issued to an industry which just happened to be discharging toxic substances, or to obliterate the known practice of EPA in not excluding toxic substances from those pollutants for which a variance might be granted under BPT effluent limitations. Neither does the legislative history justify such a construction. See 3 U.S. Code Congressional and Administrative News, 1977, p. 4326 et seq. The interpretation of the statute by EPA is entitled to some deference. *E. I. duPont de Nemours v. Train*, 430 U.S. 112, 135 n. 25, 97 S.Ct. 965, 978 n. 25, 51 L.Ed.2d 204 (1977). It is also true that retroactive application of a statute is not favored. *Union Pacific RR Co. v. Laramie Stockyards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913). In our case, § 301(*l*) speaks to preventing the *modification* of any requirement of § 301 as it applies to any specific pollutant on the toxic pollutant list. On its face, it might thus be said to apply to such parts of the statute as § 301(c) which speaks of *modifying* requirements for BAT limitations. Indeed, in § 301(g), 33 U.S.C. § 1311(g), also a part of the 1977 amendments, it is provided that the Administrator, with the concurrence of the State, shall *modify* BAT requirements with exceptions including toxic pollutants. While this may well be an indication of Congressional intent that the statute should be read as EPA reads it, that § 301(*l*) applies only to those sections of § 301 which in terms permit

*modification*, in all events the best that can be said for § 301(*l*) is that it is not clear. That being true, we give weight to the construction the administering agency has placed upon the statute, and, when we consider that retroactivity is not favored, we are of opinion that § 301(*l*) does not apply so as to require the exclusion of toxic substances from BPT variance provisions.

Our ruling today is limited to the holding that BPT variance regulations need not exempt toxic pollutants. We do not consider whether or not, or how, EPA will construe § 301(c) with relation to § 301(*l*). That question is not before us and its consideration would be premature.

Accordingly, being of opinion that EPA's amendments to 40 CFR §§ 423.12(a), 423.-22(a), 423.32(a), and 423.42 are sufficient to permit a compliance by the agency with our opinion and mandate, the petition of the industry to require further consideration of this matter by EPA is denied. (This petition was filed in case No. 74–2096.) The petition of the industry dealing with the same subject in case No. 78–1701 is likewise denied for the same reasons.

The petitions of NRDC are also denied for the reasons stated in this opinion. (These petitions were filed in cases Nos. 78–1878 and 78–1902.)