**BURNHAM CORPORATION, Plaintiff,**

v.

**Valdas ADAMKUS, Regional Administrator, Region V Environmental Protection Agency, et al., Defendants.**

No. C2–88–0562.

United States District Court, S.D. Ohio, E.D.

Oct. 25, 1990.

Robert L. Brubaker, Martin S. Seltzer, Michael J. Rourke, Porter, Wright, Morris & Arthur, Columbus, Ohio, for plaintiff; Douglas E. Kliever, Harold M. Shaw, James W. Poirier, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., of counsel.

D. Michael Crites, U.S. Atty., James E. Rattan, Asst. U.S. Atty., Columbus, Ohio, Roger J. Marzulla, Asst. Atty. Gen., Land and Natural Resources Div., Letitia J. Grishaw, U.S. Dept. of Justice, Washington, D.C., for defendants; Lee R. Tyner, Caroline Wehling, Office of General Counsel, E.P.A., Washington, D.C., Jerome Kujawa, Asst. Regional Counsel, U.S. Environmental Counsel, Chicago, Ill., of counsel.

## MEMORANDUM AND AMENDED ORDER

HOLSCHUH, Chief Judge.

### BACKGROUND

Burnham Corporation ("Burnham") owns and operates an iron foundry located in Zanesville, Ohio. Burnham uses an air pollution control device called a wet scrubber to remove lead, cadmium, and other pollutants from the air emissions produced by the foundry furnace. The scrubber produces a sludge containing the captured air pollutants which is a hazardous waste having the characteristic of EP toxicity for lead and cadmium as defined in 40 C.F.R. § 261.24. Before May, 1987, Burnham treated the sludge in a three-sided concrete structure, called the mix pad, and then sent

the sludge off-site for disposal. Burnham's concrete mix pad was an interim status hazardous waste management unit under the Resource Conservation and Recovery Act ("RCRA"). 42 U.S.C. § 6925(e). RCRA establishes a program for the management of hazardous waste. 42 U.S.C. §§ 6901 *et seq.*

On October 15, 1986, Burnham submitted closure plans for the concrete mix pad to both the Environmental Protection Agency ("EPA") and the Ohio Environmental Protection Agency ("OEPA"). After Burnham made some revisions in its plan, both agencies approved Burnham's final version of the closure plan which provided both for the decontamination of the mix pad and other equipment, and for the excavation of the waste pile soil in the immediate area which had been affected by the operation of the mix pad. Among other things, Burnham's closure plan directed that waste pile soil was to be excavated if the levels of lead and cadmium found in the waste pile soil exceeded the levels found in "background" soil as determined by samples taken from foundry areas away from the waste pile location.

Then, following the procedures outlined by its approved plan, Burnham closed the concrete mix pad. The OEPA accepted Burnham's certification of its closure of the mix pad as following the plan's outlined procedures. According to the plan, the extent of the waste pile soil to be excavated from the area was to be determined by reference to background soil samples taken from other locations within the foundry itself. Yet, the soil sampling conducted jointly with the closure showed significantly higher levels of lead and cadmium in the areas designated for background samples than the EPA had expected. Therefore, under its plan, since the background soil samples showed high levels of lead and cadmium, less waste pile soil from the mix pad area needed to be excavated.

Thus, the EPA refused to accept Burnham's certification of closure. Instead, the EPA requested that Burnham modify and resubmit its closure plan to adjust for the high levels of contamination found in the

background samples. On April 27, 1988, EPA Assistant Regional Counsel Jerome Kujawa wrote to Burnham to inform them of the risks involved in building over contaminated soils due to the difficulty such structures present if corrective action to reduce pollution problems later proves necessary. Again, on May 25, 1988, Mr. Kujawa wrote to Burnham to repeat the EPA's concerns regarding the prudence of Burnham's plans to construct a wastewater treatment plant over contaminated soil. In further correspondence, the EPA recommended that either Burnham remove contaminated soil before beginning new construction at the waste pile site or refrain from new construction over contaminated soil without EPA approval.

By November of 1989, Burnham had substantially completed its construction of the wastewater treatment plant under the terms of a National Pollutant Discharge Elimination System Permit ("NPDES Permit") issued by the OEPA. Under the NPDES Permit, Burnham has chosen to build and has built one of the wastewater plant facilities at the location where the mix pad previously existed.

Consequently, on May 20, 1988, Burnham filed suit against the Regional Administrator, officials and employees of the EPA to compel the EPA to accept its closure certification and to challenge the legal significance of the EPA's recommendations regarding the Burnham's proposed new construction over the previous waste pile site. When, in July of 1988, the EPA accepted Burnham's closure certification and withdrew its request for a modification of the closure plan, the parties stipulated to dismiss Burnham's first three claims against the EPA, since all three claims dealt with the EPA's refusal to accept the closure certification.

Its only remaining claim for relief, Burnham's fourth claim for relief is that the EPA has taken two unlawful actions. Burnham alleges first that the EPA has demanded that Burnham not engage in any construction at its foundry site without prior EPA approval or removal of the contaminated soil, and second, that the EPA has

determined that soil is contaminated if it contains lead or cadmium concentrations in excess of the Ohio farm soil levels or in excess of background levels unaffected by manufacturing operations. Thus, Burnham asserts that these allegedly unlawful EPA actions adversely affect Burnham by jeopardizing Burnham's ability to comply with an OEPA order requiring the construction of a wastewater treatment plant and by threatening a construction project which is important to the economic viability of Burnham's foundry.

Burnham has moved for summary judgment on its fourth claim for relief. Under Fed.R.Civ.P. 12(b)(1) and 12(b)(6), the EPA has moved to dismiss Burnham's claim for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Due to its ruling on the EPA's motion to dismiss for lack of subject matter jurisdiction, this Court need not address either Burnham's summary judgment motion or the EPA's motion to dismiss for failure to state a claim upon which relief can be granted.

## LEGAL ANALYSIS

When a defendant challenges subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proving jurisdiction to survive the motion, and the court has the power to resolve factual disputes. *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir.1986). Pursuant to the federal question jurisdiction of 28 U.S.C. § 1331, Burnham's complaint relies on the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*, the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201–2202, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*

■ The EPA asserts that the RCRA, the DJA, and the APA do not confer jurisdiction on this Court to resolve Burnham's claim. Neither the DJA nor the APA provides an independent basis for this Court's jurisdiction. As a procedural statute, the DJA enlarged federal judicial remedies, but it did not extend federal jurisdiction. Thus, under the DJA, an independent source of

jurisdiction is needed to grant relief. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950); *Louisville & Nashville R.R. v. Donovan*, 713 F.2d 1243, 1245 (6th Cir. 1983), *cert denied*, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984).

■ Similarly, the APA authorizes judicial review only of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Therefore, under the APA, either final agency action or an independent source of jurisdiction is needed to grant relief. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Califano v. Sanders*, 430 U.S. 99, 105–107, 97 S.Ct. 980, 984–85, 51 L.Ed.2d 192 (1977); and, *Bramblett v. Desobry*, 490 F.2d 405, 407 (6th Cir.), *cert. denied*, 419 U.S. 872, 95 S.Ct. 133, 42 L.Ed.2d 111 (1974).

Under the RCRA, federal courts of appeals are granted the authority to review EPA's final regulations, permit decisions, and state authorization decisions in accordance with the APA. 42 U.S.C. § 6976. Thus, even assuming that the advice challenged here constituted one of these enumerated types of action, RCRA provides for exclusive court of appeals review of such an action.

■ For judicial review under the APA, the challenged conduct must meet the statutory requirements of both "finality" and "agency action". The APA defines agency action as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Thus, agency action includes an agency's legal interpretations. *National Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 698 (D.C.Cir.1971). The letters sent by the EPA to Burnham are an agency statement of future effect which seek to implement, interpret, or prescribe law or policy. The letters easily fit within the agency action requirement of the APA.

Additionally, agency action must be final before judicial review will be permitted. The courts have imposed this finality element as a pragmatic consideration to precede judicial review of administrative actions. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1516. The major case considering the finality of agency action is *FTC v. Standard Oil Co. of California*, ("*SOCAL*"), 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). In *SOCAL*, the Supreme Court held that three factors must be considered in determining final agency action: (1) whether the agency action represented a " 'definitive' statement[ ] of the [agency's] position". *Id.* at 239, 101 S.Ct. at 493 (quoting *Abbott Laboratories*, 387 U.S. at 151, 87 S.Ct. at 1516); *see also, Greater Cincinnati Chamber of Commerce v. EPA*, 879 F.2d 1379, 1382 (6th Cir.1989); (2) whether the action had a " 'direct and immediate ... effect of the day-to-day business' of the complaining parties," *SOCAL*, 449 U.S. at 239, 101 S.Ct. at 493 (quoting *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. at 1517); *see also, Greater Cincinnati*, 879 F.2d at 1382; and (3) whether judicial review would "interfere[ ] with the proper functioning of the agency and ... the courts," *SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494.

The first element of the *SOCAL* finality analysis, whether the letters are a definitive statement of the EPA's position, is illustrated by *Abbott Laboratories*, 387 U.S. 136, 87 S.Ct. 1507, and *Helco Products Co. v. McNutt*, 137 F.2d 681 (D.C.Cir.1943). In *Abbott Laboratories*, drug manufacturers subject to an FDA regulation sought pre-enforcement review of the FDA's interpretation of a regulation that required the prominent display of the generic drug name whenever brand names were used on drugs. *Abbott Laboratories*, 387 U.S. at 137–8, 87 S.Ct. at 1509–10. After its announcement in the Federal Register and the agency's consideration of public comments, the challenged agency interpretation was formally promulgated; it was not tentative, informal, or the decision of a subordinate official. *Id.* at 151, 87 S.Ct. at 1516. Upon their publication, the labelling regulations were immediately effective and the only alternative to compliance was to "risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs." *Abbott Laboratories*, 387 U.S. at 152–3, 87 S.Ct. at 1517. Thus, the agency interpretation was found to have the "status of law". *Id.* at 152, 87 S.Ct. at 1517.

In *Helco*, the Helco Products Company, requested an FDA advisory opinion regarding whether a hypothetical shipment of artificially colored poppy seeds would comply with the Food, Drug and Cosmetic Act. *Helco*, 137 F.2d at 681–2. After receiving an unfavorable advisory opinion from the FDA Commissioner, Helco sought a declaratory judgment that the FDA's interpretation was incorrect. *Id.* The Court of Appeals for the District of Columbia dismissed Helco's suit on the ground that the agency action which consisted solely of the advisory opinion was not sufficiently final to warrant judicial review. *Id.* at 683–4.

Yet, within its letters to Burnham, the EPA's advice was based upon Burnham's actual operations, not upon a hypothetical situation like in *Helco*. Moreover, nonfinal agency opinions are not limited to those addressing hypothetical situations. *National Automatic Laundry*, 443 F.2d at 699. *National Automatic Laundry* clarifies the proper analysis of the *Abbott Laboratories* and *Helco* factors by framing the issues in two steps: (1) the authoritative nature of the agency action, and (2) the need for further agency reconsideration of the action. *Id.* at 700. The EPA letters to Burnham lack the authoritative nature necessary to a finding of finality. The letters were signed by an assistant regional counsel of the EPA, not by the head of the agency. Even assuming that Burnham's characterization of the EPA letters as containing "demands" and "threats" is correct, it is unlikely that an interpretation by a subordinate official would be legally binding upon the EPA. *Appalachian Power Co. v. Train*, 620 F.2d 1040, 1045 (4th Cir.1980). *See also, Stauffer Chemical Co. v. FDA*, 670 F.2d 106, 108 (9th Cir. 1982) ("In general, action by subordinate agency officials is not final agency action subject to judicial review.")

Also, the letters indicate the possibility of EPA reconsideration. The letters state that a corrective action order requiring further clean-up at the site "might" be issued in the future, not that the EPA has unequivocally reached a decision regarding the need for such future clean-up. In addition, the EPA's advice regarding Burnham's future construction was prompted by the EPA's refusal to certify Burnham's closure of its waste pile; the EPA's discussion of the two different issues in inextricably intermingled within the letters. Considering the EPA's change of position regarding the closure certification, the EPA's position on the construction activities may also be changed or at least clarified.

*National Automatic Laundry* suggests that a court might decline to exercise jurisdiction over the presumptively final agency action of an agency head, when the agency head submits an affidavit to the court indicating that the decision was tentative and outlining the method for seeking reconsideration. *National Automatic Laundry*, 443 F.2d at 701. While such an affidavit might have considerable persuasive force in determining the finality of the EPA's letters, the absence of an affidavit is not an clear indication that the action is final, particularly when the action was taken by a subordinate official rather than by an agency head.

Although Burnham did not solicit the EPA's advice, the character of the advice received is nevertheless similar to that found within *Helco*. The EPA letters to Burnham more closely resemble the *Helco* agency opinion, than they do the formally-issued *Abbott Laboratories* regulations. Neither of the Burnham letters from Mr. Kujawa contain orders that Burnham undertake any specific action. The letters clearly state that these are recommendations by the EPA, not orders.

*SOCAL*'s "definitive nature of the action" element can be analyzed using another formulation which defines "final agency action" as action that "establish[es] new rights or duties" or "fix[es] a legal relationship." *Dow Chemical v. EPA*, 832 F.2d 319, 324 (5th Cir.1987); *Greater Cin-*

*cinnati*, 879 F.2d at 1382. The EPA letters neither establish new rights or duties, nor fix a legal relationship between Burnham and the EPA. The RCRA corrective action provisions provide the source of Burnham's legal duties, not the EPA's interpretation of these provisions. Burnham argues that the EPA advice is a definitive statement of the EPA position as the advice was not qualified and did not purport to be only interim advice. However, the EPA's interpretation of Burnham's duties may be final only "in the sense that no one at the agency currently plans to revise it" without being sufficiently final to confer jurisdiction. *Dow Chemical*, 832 F.2d at 323–4.

Rather than a definitive statement of the EPA's position, the EPA letters are an informal interpretation of Burnham's obligations under the RCRA. Thus, the EPA letters do not establish new duties; they only interpret Burnham's existing duties.

The second element of the *SOCAL* finality analysis is whether the agency action had a direct and immediate impact on Burnham's day-to-day operations. Agency actions that have a direct and immediate effect on day-to-day activities alter the status quo. *See, Greater Cincinnati*, 879 F.2d at 1382. Such agency actions change the affected party's primary conduct. *See, Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). However, the EPA letters have had no such effect on Burnham's day-to-day activities.

Originally, Burnham had planned to construct portions of the wastewater treatment plant in one of the areas found to have contaminated soil. Consequently, Burnham alleged that the EPA's recommendations were unlawfully preventing it from constructing facilities which were necessary to comply with the terms of its NPDES permit. Nevertheless, Burnham proceeded with this construction which was substantially completed in November, 1989. The EPA's alleged demands have altered neither the status quo nor Burnham's primary conduct. Burnham's initiation of this

action is the only change in the status quo resulting from the EPA letters.

The third element of the *SOCAL* finality analysis is whether judicial review would interfere with the proper functioning of the agency and the courts. Judicial review at this time would interfere with the proper functioning of the EPA in two ways. First, immediate judicial review would deny the EPA the opportunity to modify its position as it develops experience or obtains comments from within the regulated community. *SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494; *Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1978). Second, immediate judicial review would have a chilling effect upon the EPA's issuance of advisory interpretations. Agency advisory interpretations of both statutes and regulations provide valuable guidance to the regulated community. *See, e.g., National Automatic Laundry*, 443 F.2d at 699, 702. However, an agency might be reluctant to provide such guidance if each interpretation it issues is subject to immediate judicial review. Also, judicial review at this time would interfere with the functioning of the courts by promoting inefficient piecemeal review. *SOCAL*, 449 U.S. at 242, 101 S.Ct. at 494.

The EPA letters to Burnham do not satisfy the *SOCAL*'s test for final agency action. Thus, the challenged agency action is not "final agency action" within the meaning of section 704 of the APA. The only possible basis for this Court's jurisdiction is 28 U.S.C. § 1331, which generally authorizes district court review of final agency action in conjunction with the APA, 5 U.S.C. §§ 701–706. The agency action here is not final, and thus is not within the scope of actions that are made reviewable by a district court. Hence, this Court lacks jurisdiction to review the challenged agency action.

## CONCLUSION

This Court concludes, for the reasons stated, that this Court lacks jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure to review the challenged EPA action. Therefore, the plaintiff's fourth claim for relief is DISMISSED, and this action is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.