CENTER FOR SCIENCE IN THE PUBLIC INTEREST, et al., Plaintiffs,

v.

DEPARTMENT OF THE TREASURY, et al., Defendants.

Civ. A. No. 82–610.

United States District Court, District of Columbia.

Feb. 9, 1983.

Bruce Silverglade, Center for Science, Washington, D.C., for plaintiffs.

A. Patricia Frohman, Asst. U.S. Atty., Washington, D.C., for defendants.

Arnold M. Lerman, Washington, D.C., for Wine Institute.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Plaintiffs, the Center for Science in the Public Interest (CSPI), a consumer health organization, and two individual consumers brought suit under the Federal Alcohol Administration Act and the Administrative Procedure Act against the Department of the Treasury (the Department) for rescinding alcoholic beverage ingredient disclosure regulations.[1] These regulations, promulgated in 1979, were designed to inform consumers, especially those with allergies, of the contents of alcoholic beverages. Defendant Wine Institute was permitted to intervene in support of the Department's decision to rescind and Banfi Products Corporation filed a brief as *amicus curiae* in support of plaintiffs' position. The case is now before us on the parties' cross-motions for summary judgment.

### I.  *History of the Action*

#### A.  *Statutory Background*

The statutory authority for the Treasury Department's regulation of alcoholic beverages [which it exercises through the Bureau of Alcohol, Tobacco, and Firearms (BATF)], is the Federal Alcohol Administration Act, 27 U.S.C. § 201 *et seq.* (1976) (the Act). The Act, originally passed in 1935, directs the Secretary of the Treasury to prescribe regulations

> ... with respect to packaging, marking, branding, and labeling and size and fill of container (1) as will prohibit deception of the consumer with respect to such products or the quantity thereof and as will prohibit, irrespective of falsity, such statements relating to age, manufactur-

---

1.  T.D. ATF–66 issued June 13, 1980.

ing processes, analyses, guarantees, and scientific or irrelevant matters as the Secretary of the Treasury finds to be likely to mislead the consumer; (2) as will provide the consumer with adequate information as to the identity and quality of the products, the alcoholic content thereof ... the net contents of the package, and the manufacturer or bottler or importer of the product....

27 U.S.C. § 205(e) (1976).

At the time the Act was passed, the Director of the Federal Alcohol Control Administration, predecessor of BATF, explained the congressional intent of Section 205(e):

Now, the provisions of this bill show that the purpose was to carry that regulation into certain particular fields in which control of interstate commerce in liquors was paramount and necessary ....

These regulations were intended to insure that the purchaser should get what he thought he was getting, that representations both in labels and advertising should be honest and straightforward and truthful. They should not be confined, as the purefood regulations have been confined, to prohibitions of falsity, but they should also provide for the information of the consumer, that he should be told what was in the bottle, and all the important factors which were of interest to him about what was in the bottle.

HEARINGS ON H.R. 8539 BEFORE THE HOUSE COMMITTEE ON WAYS AND MEANS, 74th Cong., 1st Sess. 10 (1935) (statement of Joseph H. Choate).

On February 25, 1979, BATF, in order to implement its statutory mandate, published several proposed regulations calling for ingredient labeling in the Federal Register. Congress was aware of BATF's decision. In 1979, after the BATF announcement, the House Committee on Appropriations attempted to prohibit the expenditure of funds in connection with the promulgation

of such regulations. H.R.REP. NO. 248, 96th Cong., 1st Sess. 10 (1979). The Senate Committee on Appropriations, however, supported the proposed regulations:

On February 2, 1979, the Bureau published in the Federal Register several proposed regulations which would require the ingredient labeling of alcoholic beverages. The Committee believes that these regulations, accommodated for the substantive points raised by the industry and other interested parties, should be of benefit to the public.

S.REP. NO. 299, 96th Cong., 1st Sess. 12 (1979).

The Conference report reflects that the limiting amendment proposed by the House was rejected.

Amendment No. 7: Deletes language proposed by the House and stricken by the Senate which prohibits the use of funds for issuing or carrying out proposed rules on labeling of wine, distilled spirits and malt beverages.

H.R.CONF.REP. NO. 471, 96th Cong., 1st Sess. 6 (1979).

### B. *Promulgation of the Ingredient Labeling Regulation*

BATF has been considering ingredient labeling proposals for the last decade. It first proposed such regulations in 1974 but no final rule was promulgated at that time. The regulations which were proposed in February, 1979 and are the subject of this suit were published and a final rule was issued on June 13, 1980.[2] BATF explained that:

This rule requires ingredient disclosure on labels of wine, distilled spirits, and malt beverages. These regulations, however, provide an exception to this requirement. Under this exception the ingredient list will not be required to appear on the label when the producer, bottler, or importer: (1) elects to make an ingredient list available upon request; (2) places a statement on the front label or a sepa-

---

**2.** T.D. ATF–66 became effective on October 13, 1980, but was not made mandatory until January 1, 1983.

rate strip label notifying the consumer of the availability of an ingredient list and provides the name and, somewhere on the label, a full mailing address in the United States where such an ingredient list can be obtained upon request; and (3) does not place a statement on the label which could be misconstrued to be an ingredient list. This exception gives industry maximum flexibility to provide ingredient information at minimum cost. At the same time, it provides consumers who have the need or desire to avoid various ingredients a means to do so, thus meeting the objective of the regulatory proposal. Because of special health problems, this rule also mandates the disclosure on the label, in all instances, of the presence of FD & C Yellow No. 5 whenever it is used in a product.

45 Fed.Red. 40538 (1980).

In its final publication on June 13, 1980 in the Federal Register, BATF devoted six pages to explaining its reasons for issuing the regulations. It detailed the steps of its Regulatory Analysis, which included an outline of the possible steps that could be taken to deal with the problem of ingredient disclosure, a consumer poll, and a cost-benefit study conducted by the BDM Corporation, a private consultant hired by BATF. The Bureau also received 1,873 comments in response to Notice No. 314 from consumers, special interest groups, industry members, doctors, government agencies, and members of Congress.

The BDM study emphasized that widely different conclusions could be reached concerning the value of ingredient labeling, depending on the assumptions used. Major findings of the study included:

2. Estimates of expected costs of mandated ingredient labeling to industry and the Government based on the information submitted, range between a low of $12 million per year to almost $150 million per year. The major factors that contribute to this range of estimates are the use of a back label, advertisement costs, and markups that might be applied by the industry at different points in the distribution channel. The 'advertisement costs' were submitted directly to BDM by one winery after the comment period and from this one submission BDM estimated a total annual $25 million advertising cost for the entire wine industry.

3. Start-up costs amount to approximately $18 million for the entire industry if no additional back labels are used; if additional back labels are used by all producers not presently using back labels, the 'total potential investment cost for the three industries, as reported by the industries, are in excess of $35 million.'

4. BDM found 'strong evidence' in the medical research literature that indicated 'ingredients used in alcoholic beverages can cause adverse health effects in humans.' BDM found that while most of the effects are not necessarily severe, some are severe. The study also reports that adverse effects are 'not limited to allergic reactions.' It is impossible, however, to determine exactly either how many people are affected (the range BDM gave is anywhere from 475,000 to 1,700,000) or how much money in health costs could be saved if ingredients were listed. (A wide range of estimates ranging from approximately one-half million dollars to four hundred million dollars was considered possible, depending on which assumptions were considered the most appropriate.)

45 Fed.Reg. 40539 (1980).

It is important to note that the BDM study did not contemplate the option that the final regulations gave to manufacturers to provide ingredient lists to consumers upon request and to make known the availability of such lists by stating on the label the name and address where such lists can be obtained. The study also did not address the health benefits of ingredient labeling other than prevention of allergic reactions.[3]

---

**3.** As plaintiff indicates, "The medical literature contains at least one case in which doctors plainly stated that they could have saved the lives of their patients who were dying from the

Based on the BDM study, the poll of consumers, and the comments and studies submitted in response to the proposed rule-making, the Treasury Department stated that it was

... convinced that the disclosure of ingredients used in the production of alcoholic beverages is of real value. This disclosure will provide consumers with adequate information about the identity and quality of the product which will enable a consumer to make an informed choice in the purchasing of alcoholic beverages .... However, to minimize the costs while still meeting basic policy objectives, producers, bottlers or importers who elect to make ingredient lists available upon request, notify consumers of their availability, and who avoid implied label statements about ingredients, will not be required to list ingredients on the label.

45 Fed.Reg. 40540 (1980).

## C. Rescission of the Regulations

We turn now to the basis for the present litigation.

In the face of this prior record, the Department of the Treasury on May 4, 1981 published another notice of proposed rulemaking, this time notifying the public of its intent to rescind the ingredient labeling regulations. 46 Fed.Reg. 24962 (1981). The one-page notice stated that "... the Department has reviewed comments received in response to Notice No. 314, published in the Federal Register on February 2, 1979 [44 FR 6740]. As a result of that review, the Department is proposing to rescind (the regulations)." 46 Fed.Reg. at 24962.

The review of the comments and regulations purportedly was prompted by Executive Order No. 12291, 46 Fed.Reg. 13193 (1981), which "... directs each Federal Agency to review existing regulations with the aim throughout the Government of maximizing the benefits to society while at the same time imposing the least burden to achieve these benefits." Defendants' Statement of Material Facts at 2. The Department, "as a result of the review of existing regulations called for by Executive Order 12291, ... concluded that (T.D. ATF–66) is not in accord with the President's mandate," 46 Fed.Reg. 24963 (1981), and thus proposed rescission.

On November 6, 1981, BATF announced its final rule rescinding the June 13, 1980 regulations. The basic reasons for reversing its previous decision were set out in two paragraphs which, in summary state that: (1) The Department has concluded, within its discretionary authority under the Act, "... that ingredient labeling regulations would result in increased costs to consumers and burdens on industry which are not commensurate with the benefits which might flow from the additional label information," and (2) the Department further concluded "... that ingredient labeling would not result in an appreciable benefit to consumers when compared to the existing label information requirements and standards of identity." 46 Fed.Reg. 55094 (1981). The notice also mentioned that the regulations were incompatible with United States international commitments and E.O. 12291.

## II. Standard of Review

### A. The Case for Heightened Scrutiny

Plaintiffs argue that Treasury's decision to rescind the regulations is substantively invalid under the Act and procedurally invalid under the informal rulemaking requirements of the Administrative Procedure Act. In considering these claims, we are well aware of the limited role a court traditionally plays in reviewing agency decisions. It "must consider whether the decision was based on a consideration of the relevant factors .... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered

effects of cobalt sulfate, a beer foam enhancer, had they known that the additive was in beer consumed by these unfortunate individuals."

Plaintiff's Amended Memorandum at 19–20, citing ADMIN.REC., Part II, Vol. D. Comment No. 6000.

to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Thus, an agency action in most cases will be held unlawful only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1976).

■ In the case before us, however, we are confronted with a factual record which may very well justify a higher standard of review. As the plaintiffs argue, where the health of the public is at issue, "close scrutiny of administrative action is particularly appropriate...." *Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C.Cir.1971). Defendants apparently concede this but argue instead that the disclosure requirements of the Act were enacted in order to provide information to the consumer, not to protect the consumer's health. Defendants' Opposition to Plaintiffs' Motion at 2. We submit that merely providing information is in and of itself not the reason for the Act. Rather, Congress wanted consumers to have information for a clear purpose—to allow them to make decisions that might affect their health. *See* C. SANDS SUTHERLAND'S STATUTORY CONSTRUCTION § 71.03 (4th ed. 1974).

■ A second justification for subjecting Treasury's decision to rescind to greater scrutiny is that this case involves final regulations which were rescinded a little more than a year after being promulgated. In our judgment, this fact alone is a signal that careful examination is required. Here, the regulations were issued by one administration and shortly thereafter rescinded by the next under the purported aegis of Executive Order 12291, the President's mandate on less government regulation. Although we recognize that basic political differences between administra-

tions may be manifested in the way in which they choose to exercise their discretionary functions, "sudden and profound alterations in an agency's policy constitute 'danger signals' that the will of Congress is being ignored." *State Farm Mutual Auto Insurance v. Department of Transportation*, 680 F.2d 206, 221 (D.C.Cir.1982) *cert. granted,* —— U.S. ——, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982). Thus, the Court of Appeals in this circuit has stated that "... where policy has been altered, the court should be satisfied both that the agency was aware it was changing its views and has articulated permissible reasons for that change, and also that the new position is consistent with the law." *N.A.A.C.P. v. F.C.C.*, 682 F.2d 993, 998 (D.C.Cir.1982).[4] Here, it is undisputed that the agency was well aware that it was reversing its prior policy. Two ultimate questions, *i.e.*, whether the change was supported by explicit, permissible reasons and whether it was in accordance with the law, remain to be determined. In summary, we conclude that a greater degree of scrutiny is required in the case of an action which reverses prior policy than for an action setting policy for the first time.

### B. *Review of the Decision to Rescind T.D. ATF-66*

Plaintiffs specifically object to the rescission on three levels. First, they argue that the decision was illegal because Treasury's actions taken pursuant to Executive Order No. 12291 conflicted with its statutory mandate under the Act. Secondly, plaintiffs claim that Treasury violated the substantive requirements of the Administrative Procedure Act because it failed to explain why it reversed its prior conclusion that the rule was cost-beneficial and necessary. Lastly, plaintiffs allege that Treasury did not act in accordance with the

---

**4.** Defendants argue that the cases cited by plaintiffs on this issue "typically involve a change in a long-standing policy or interpretation by an agency, upon which others had come to rely, rather than a change in regulations (which had never gone into effect)...." Defendants' Opposition at 1. We agree with plaintiff's response

that "[J]ust as in the present case, the court in *State Farm* was responding to the rescission of a final rule that had become effective, but that had not yet become mandatory." Plaintiff's Rebuttal Memorandum at 5. *See also* 27 C.F.R. Parts 4, 5 and 7 (1981) (codification of the regulations as a final rule).

procedural aspects of the Administrative Procedure Act. We consider each of these contentions.

1. *Application of E.O. 12291 to Regulations Issued Pursuant to FAA Act § 205(e)*

■ Plaintiffs contend that Treasury's application of E.O. 12291 to the ingredient labeling regulations violated its statutory mandate.[5] The order is of general application and requires all agencies to consider the societal costs and benefits of all regulations, "taking into account the condition of the particular industries affected by the regulations...." 46 Fed.Reg. 13193–94 (1981). The FAA Act directs the Secretary of the Treasury to prescribe regulations "as will provide the consumer with adequate information as to the identity and quality of the products." Plaintiffs believe that Congress in the statute has made its policy choice in favor of providing information to the consumer and that Treasury may not now change the balance to give controlling weight to other interests, such as cost to the industry, which it believes to be equally important.

Defendants respond that Congress itself took costs into account when considering different regulations under the FAA Act. Defendants' Opposition to Plaintiffs' Motion at 3. The agency further justifies its position by citing *Wawszkiewicz v. Dept. of Treasury,* 670 F.2d 296, 302 (D.C.Cir.1981), in which the Court of Appeals implicitly approved Treasury's consideration of the costs of certain labeling regulations. We accept the eminent good sense of this decision because costs are always a factor in deciding the feasibility or practicality of a regulation.

Whatever the consideration given to costs and benefits, however, an agency may not substitute its policy judgment for the judgment that has already been articulated by Congress. In this case, Congress

announced that the Department had the authority to issue regulations requiring producers of alcoholic beverages to adequately inform the consumer of the identity and quality of the products, the alcoholic quantity thereof, the net contents and the name of the bottler. It did not condition such a grant of authority with a proviso that the regulations could be withdrawn if the costs to the industry turned out to be too high.

The Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), addressed a similar question of agency cost consideration. In that case, the Department of Transportation decided to build a highway through a public park, even though the statute prohibited federal construction of highways through public parks if a "feasible and prudent" alternative route existed. The Secretary decided to proceed with the project after taking into account the cost of alternative routes, safety considerations, and other factors. The Court invalidated the agency's action, saying that "Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance." 401 U.S. at 412–13, 91 S.Ct. at 821–22. There, as here, Congress has previously set the legislative agenda. Just as preservation of parkland was paramount under the Federal-Aid Highway Act, "control of interstate commerce in liquors was paramount and necessary" to protect consumers under the FAA Act.

We are further convinced that Treasury's decision conflicts with its statutory mandate in light of the congressional decision not to limit funds for the promulgation of ingredient-labeling regulations. *Supra,* at page 1170. Congress considered the 1979 decision to promulgate ingredient-labeling regulations, and by rejecting amend-

---

5. Plaintiffs do not argue that E.O. 12291 is inherently illegal, but that the manner in which Treasury applied it was illegal. The Executive Order directs the departments to consider costs and benefits "to the extent permitted by law." In this case, plaintiffs argue, the FAA Act precludes the agency from considering costs to the industry as an overriding factor.

ments directed against such regulations, affirmed its original policy choice. *See National Automatic Laundry and Cleaning Council v. Schultz*, 443 F.2d 689, 706 (D.C. Cir.1971). Thus, the cost to the industry in Congress' view did not outweigh the basic belief that consumers have a right to know the contents of alcoholic beverages. In short the broad thrust of Executive Order No. 12291 provides an insufficient basis for the defendants to disregard their statutory duties imposed by Section 205(e), reflecting Congressional policy which was reaffirmed as recently as 1979.

2. *Review of the Department's Decision to Rescind Under the Administrative Procedure Act*

■ Even if the rescission did not violate the Department's statutory mandate, plaintiffs argue that it violated the substantive requirements of the Administrative Procedure Act. They claim that defendants did not explain why they reversed their prior decision that the regulations were cost-beneficial and necessary to protect the health and welfare of consumers.

Defendants finalized the decision to rescind in the November 6, 1981 notice, 46 Fed.Reg. 55093 (1981). *Supra*, at page 1172. The notice contains a summary of the comments received after Treasury announced that it was proposing rescission,[6] and sets out four reasons for rescission: (1) the ingredient labeling regulations did not meet the criteria of E.O. 12291; (2) the regulations were not in keeping with United States' international commitments; (3) the costs to consumers and the industry were greater than the benefits which would be derived from the additional label infor-

mation, and (4) existing label information is adequate. 46 Fed.Reg. 55094 (1981).

We have discussed the first basis for decision, conformance with E.O. 12291, *supra*. We now deal with the question of whether the other three proffered explanations constitute permissible reasons for change.

(a) *The Claim of Adverse Effects on International Commitments*

Defendants only reference to international trade in the final notice of rescission is the statement that "... the Department has concluded that the regulations were not in keeping with United States international commitments." 46 Fed.Reg. 55094 (1981). The Department provided no explanation in either the notice of the proposed rescission or in the notice of rescission itself of why it believed that the regulations would violate international commitments.

Defendants in their brief note certain comments submitted to BATF that related to the exporting and importing of alcoholic beverages. This does not suffice as a substitute for the required reasoned explanation by the agency. The agency must do more than point to comments that allege that the regulations will have disastrous effects if implemented. They must supply a reasoned explanation for the decision and why they were convinced by those comments rather than the comments expressing the opposite view. This is especially necessary in a case such as this where the conflicting view was adopted just one year earlier. *See* 45 Fed.Reg. 40540 (1980). From the initial announcement in the Federal Register,[7] it appears that Treasury had

---

**6.** Defendants, in their memorandum supporting their motion, provide an even more detailed description of the comments received, but we are skeptical of the relevance of the comments in light of the fact that the agency did not utilize many of the comments in its reasons for decision. We are also skeptical of using the comments as a type of referendum or head count on the issue of whether the regulations should be rescinded. First, the agency's role is to use its expertise to carry out the congressional intent. It may use the comments as a source of information, but to rely completely on the comments

as a basis for decision renders the administrative process meaningless. Secondly, plaintiffs supply strong evidence that many of the comments received were part of an industry effort to pad the administrative record. Plaintiff's Rebuttal Memorandum at 13.

**7.** In the text of their notice of proposed rulemaking, defendants indicated that they were rescinding the Ingredient Disclosure Rule pursuant to E.O. 12291: "As a result of the review of existing regulations called for by Executive Order 12291, the Department *has concluded* that

made a decision to rescind. Its later recital of comments and conclusions coincided with this prior decision. Without a more detailed justification for this sharp reversal, this, at least on the surface, represents a good example of arbitrary and capricious decision-making.

(b) *The Claim That Costs to Consumers and the Industry Outweigh the Benefits*

A third rationale for the decision to rescind was that "... ingredient labeling regulations would result in increased costs to consumers and burdens on industry which are not commensurate with the benefits which might flow from the additional label information." 46 Fed.Reg. 55094 (1981). Again, defendants were required to provide a reasoned explanation for their action and not simply state that they disagreed with the conclusions the Department reached the previous year.

It is possible that less of a showing is necessary if the previous decision had been without adequate explanation or was unreasonable on its face. To the contrary is true. The Department's initial decision to issue the regulations was the result of years of research and careful consideration, a fact evidenced by the June 13, 1980 notice, 45 Fed.Reg. 40583 (1980). It was predicated on an impressive factual record, which documented the range of costs to industry and the savings in health costs to consumers.

In addition to the monetary costs and benefits, the BDM study estimated that the number of people allergic to the ingredients in alcoholic beverages ranged anywhere from 475,000 to 1,700,000. The Department recognized that the precise level of harm to consumers could not be established, but stated its conclusion "that consumers who are allergic to certain ingredients generally should be able to find out, whether from the label or some other source, if those ingredients are used in alcoholic beverages so that they can avoid the possibility of adverse reactions if they so choose." 45 Fed.Reg. 40540 (1980). The agency thus realized that when directed to issue regulations related to the public health and consumer protection, it could not base its conclusions solely on monetary calculations, but that it must also recognize the intangible benefits flowing from such regulations. Based on the information that it had gathered, Treasury in 1980 decided that the advantages of ingredient labeling outweighed the costs. Even though it believed that regulations which required ingredients to be listed on the bottle were justified on a cost-benefit basis, BATF, in an effort to take into account some of the comments submitted by members of the industry, provided an alternative to ingredient labeling:

> ... to minimize the costs while still meeting basic policy objectives, producers, bottlers, or importers who elect to make ingredient lists available upon request, notify consumers of this availability, and who avoid implied statements about ingredients, will not be required to list ingredients on the label.

45 Fed.Reg. 40540 (1980).

Defendants did not consider this address label option in either the notice proposing rescission of T.D. ATF–66 or in the final notice of rescission. When the Department issued the regulations in 1980, it structured an alternative in an effort to provide consumers with information at minimal cost. The Department now says that the regulations imposed too great a burden on the industry but makes no attempt to assess the marginal cost of the address label option. In our judgment, it acted in an arbitrary and capricious manner, especially in light of industry comments expressing the view that such an option would be an acceptable alternative to ingredient labeling. 45 Fed.Reg. 40583 (1980).[8]

---

T.D. ATF–66 [the Ingredient Disclosure Rule] is not in accord with the President's mandate." (emphasis supplied). 46 Fed.Reg. 24963 (1981).

8. It is also interesting to note that all of the arguments in defendants' briefs, with the exception of the supplemental brief we requested specifically addressing the issue, were directed

We are convinced that the existence of the address label option undermines the cost arguments advanced by defendants for two reasons. First, as defendants themselves noted, "... allergic consumers are presently furnished an address where they can write for information since present regulations require that an address appear on the bottle." [9] Opposition of Federal Defendants to Plaintiffs' Motion for Summary Judgment at 7. Secondly, industry members have indicated that they already respond to requests for ingredient information, so that a formal requirement that they must respond would theoretically only codify existing practice.

Because regulations already require some address to be printed on all alcoholic beverage containers and because industry members contend that they presently respond to consumer requests, defendants are faced with the heavy burden of demonstrating that the costs of compliance with the regulations require their rescission. Not one sentence in the notice proposing rescission or in the rescission itself addresses the costs of the labeling option. [10]

In sum, we are persuaded that Treasury has not met its burden of providing a reasoned explanation for its decision on the ground that the costs of the regulations outweigh the benefits.

### (c) The Claim that Existing Label Information is Adequate

Defendants asserted in the notice of rescission that current "standards of identity" provide sufficient information to the consumers of alcoholic beverages, and that all the substances used in alcoholic beverages have received F.D.A. approval. Standards of identity, according to the Department, "generally identif[y] the basic agricultural ingredients and further, [set] forth parameters of production and alcoholic content." 46 Fed.Reg. 55094 (1981). [11]

This argument, while having a certain superficial appeal, is not convincing in the factual context of this case. Defendants fail to explain why the Department is satisfied that the standards of identity and F.D.A. approval of ingredients sufficiently protect consumer interests, when just a year earlier, it made the determination that these measures did not provide "adequate information" as required by the statute.

On the other hand, plaintiffs advance several reasons to doubt defendants' conclusory statement that ingredient labeling "would not result in an appreciable benefit to consumers when compared to the existing label information requirements and standards of identity." 46 Fed.Reg. 55094 (1981). First, standards of identity exist only for wine and distilled spirits, not for beer or other malted beverages. Secondly, plaintiffs have supplied a list of the additives that alcoholic beverages may contain, which demonstrate that although the standards of identity are required to set forth the basic agricultural ingredients found in alcoholic beverages, they do not disclose "any of the hundreds of possible other foam enhancers, stabilizers, anti-oxidants, chill-proofing agents, preservatives, coloring agents, or artificial flavors which may be used in the beverages and which consumers need to know for health reasons." Plaintiffs' Amended Memorandum at 26, Pltfs' Ex. F.

Defendants' misplaced reliance on standards of identity and F.D.A. approval of

---

toward that part of the regulation which required ingredient labeling. Defendants have made no effort to show that the regulations, *including the address label option*, were not cost-beneficial or reasonable under the Act.

**9.** The extant regulations only require a city and state address, however, and not a street address or zip code. The rescinded regulations would have required the entire address.

**10.** Plaintiffs demonstrate that the new regulations are necessary because they require that

the address label contain the words "For information about this product, write:" before their mailing addresses, and because although industry members say they respond to requests, there is nothing that requires them to respond. Plaintiff's Supplemental Brief at 4–5.

**11.** Standards of identity for wine and distilled spirits are codified at 27 C.F.R. §§ 4.2, 5.22 (1982).

ingredients as a way to protect consumers is illustrated by their approach to FD & C Yellow No. 5, a color additive used in alcoholic beverages, to which plaintiffs make specific reference. There is "mounting evidence of allergic-type reactions to FD & C Yellow No. 5," 44 Fed.Reg. 37212 (1979), but the use of the additive is not reflected in standards of identity and the Department would not now require that notice of its use in a product be disclosed on the container's label. This is a matter of particular concern since the F.D.A. recently amended its regulations and now allows the additive to be used only if the food manufacturers disclose the existence of the additive on the label. 44 Fed.Reg. 37212 (1979). For Treasury to contend that the new regulation was unnecessary because the ingredients had met F.D.A. approval is plainly misleading, since that approval was explicitly conditioned upon disclosure. The F.D.A. has recognized that certain substances are not universally safe, and that there is sufficient risk associated with their use to compel food manufacturers to disclose the presence of such additives in their products.

We are convinced that the Department of the Treasury has not adequately justified its decision to rescind the ingredient labeling regulations. We are cognizant of the deference which courts traditionally accord to the decisions of administrative agencies. If we were to approve this decision, however, we would be ignoring our obligations under the Administrative Procedure Act and acting as little more than a "rubber stamp." We are required to reject agency actions such as this which are ill-considered and superficially explained.

3. *Review of Treasury's Actions Under the Procedural Requirements of the Administrative Procedure Act*

In view of the disposition previously indicated it is not necessary to consider plaintiffs' procedural objections at any length. They deserve, however, more than passing reference. Basically, plaintiffs allege that they were denied a meaningful opportunity to be heard because defendants had succumbed to political pressure and had decided to rescind the rules even before comments were solicited. They also contend that a number of *ex parte* contacts occurred which should have been logged and disclosed in order to provide a complete record of the rulemaking. We do not think that these are valid objections to the agency's conduct.

It is important to note that this is not an adjudicative decision by the agency, nor is it a decision that can only be made after a formal rulemaking. As an example of informal rulemaking, our concern for undisclosed and unrecorded contacts in this context is less than in the other two more sensitive proceedings.

■ Considering the *ex parte* contacts allegation specifically, plaintiffs have failed to convince us that 5 U.S.C. § 553 (1976) requires that an agency disclose and log all contacts when it is engaging in informal rulemaking. The rule simply allows interested parties to submit material for the agency's consideration—it does not require that the agency record all the information it receives. Plaintiffs cite *Sierra Club v. Costle*, 657 F.2d 298, 403 for the proposition that an agency must disclose all *ex parte* contacts. The case concerns the Clean Air Act Amendments, however, not the A.P.A., and it only held that the Environmental Protection Agency should use its discretion to determine when oral communications had been of central importance to the decision and should thus be recorded. Nothing in that case requires disclosure of all contacts in this case.

■ We are similarly convinced that no procedural flaws existed as a result of the congressional communications. We know that there are some instances in which the congressional interference with agency action has been so great as to taint the agency's decision, but in our view, letters and phone calls from congressmen urging rescission do not constitute this sort of interference. It can be plausibly argued that communications from congressmen on behalf of constituents are part of any con-

gressman's duty of proper representation. Plaintiffs cite no case, and we know of none, in which an agency decision was invalidated because the agency had received letters from congressmen arguing for a certain outcome.

CONCLUSION

Because this Court finds that the Department of the Treasury has violated both its statutory mandate under the Federal Alcohol Administration Act and the Administrative Procedure Act, we hold invalid and set aside its decision to rescind the ingredient labeling regulations contained in T.D. ATF–66.

An order consistent with the foregoing has been entered this day.